[No. S122744. June 29, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
DEVANCE SAUNDERS, Defendant and Appellant.

### COUNSEL

George O. Benton, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Martin S. Kaye and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**BAXTER, J.**—May a peace officer order a traffic stop to investigate possible Vehicle Code violations when the vehicle's front license plate is missing and the registration tabs on the rear license plate have expired but the vehicle's rear window displays what appears to be a current temporary operating permit? We conclude that such an investigative stop does not run afoul of the Fourth Amendment, at least when the officer has no other ready means of verifying the vehicle's compliance with the law. We therefore affirm the judgment of the Court of Appeal.

### BACKGROUND

Defendant Devance Saunders appeals the denial of his motion to suppress evidence (Pen. Code, § 1538.5, subd. (i)) after having pleaded guilty to carrying a concealed weapon (*id.*, § 12025, subd. (a)(2)), carrying a loaded firearm (*id.*, § 12031, subd. (a)(2)), and being a felon in possession of a firearm (*id.*, § 12021, subd. (a)) and ammunition (*id.*, § 12316, subd. (b)). The following uncontradicted facts are taken largely from the Court of Appeal opinion in this case.

On March 31, 2002, San Jose Police Officers Mark Womack, Brian Simuro, and Javier Acosta were in an unmarked car near Club Rodeo on Coleman Avenue in San Jose. They were patrolling a gathering of motorcycle clubs engaged in an annual ritual called a "blessing." The blessing included members of the Hell's Angels, the Mongols, and several other clubs, including the Soul Brothers, who were associated with the Hell's Angels. The officers had knowledge of ongoing tensions between the Hell's Angels and the Mongols and of the clubs' involvement in violence and weapons possession on previous occasions. At the previous year's blessing, members of the Hell's Angels were arrested for possession of automatic weapons and ammunition. Additionally, Officer Womack had earlier that day participated in a traffic stop of a Hell's Angels vehicle and found weapons and body armor inside the vehicle.

Around 10:30 a.m., the officers saw a Chevy pickup truck following directly behind 15 to 20 Soul Brothers members riding their motorcycles on Coleman Avenue. The officers were aware that the vehicle preceding or following a group of motorcycle club members is often the "load" or "tail" car, which carries other members, wives or girlfriends of the members, weapons, and drugs. After Officer Womack noted that the pickup had expired registration tabs and no front license plate, the officers stopped the vehicle. Both the driver, Roosevelt Ingram, and defendant, the passenger, wore leather jackets with "Soul Brothers" patches. When Officer Simuro went to the driver's side of the truck, Ingram asked why he had been stopped. The officer explained it was because of the missing front license plate and asked Ingram for his driver's license and registration. After Ingram complied, Officer Womack, who was on the passenger side, asked defendant "if he had any I.D. with him." Officer Womack could not recall whether he saw a temporary operating permit taped to the pickup's rear window. Officer Acosta collected the identification cards and radioed in a records check. Four or five minutes later, the officers learned that Ingram's license was suspended.

When the driver has a suspended license, it is San Jose Police Department policy to impound the vehicle. Consequently, the officers ordered both men to get out of the truck. As defendant stepped outside, Officer Womack noticed that defendant was shaking and trembling and appeared to be very nervous. His large and bulky jacket covered his waistband, where weapons are often concealed. Based on these facts and the possibility that this was a "tail" car containing weapons—like the Hell's Angels vehicle containing weapons and body armor he had seen earlier that morning—Officer Womack decided to patsearch defendant. As he stepped behind defendant to begin the patsearch, he asked defendant "if he had anything illegal on him." Defendant replied, "Yes, I have a gun in my pocket"—and, indeed, there was a loaded .25-caliber semiautomatic weapon in the inner left pocket of defendant's jacket. An inventory search of the pickup uncovered .25-caliber bullets and a speed loader containing .357-caliber bullets in a plastic baggie inside a work glove on the passenger-side floorboard.

Ingram testified at the suppression hearing that he had purchased the pickup from a wrecking yard four or five months prior to the stop. He had applied to register the vehicle in his wife's name and to get new license plates, but he "hadn't finished the smog and some few other things [he] had to do to the truck before [he] got the new license." The truck was also "missing the bumpers." The Department of Motor Vehicles (DMV) had issued Ingram a temporary operating permit sticker, which he placed in the upper right corner of the rear window. The sticker bore a large number "3," which corresponded to the month of March, and allowed him to operate the vehicle through March 31, 2002.

Connie Gonzalez, a clerk at the DMV who handles licenses and registrations, testified that a temporary operating permit is issued to a vehicle to enable the owner to legally use the vehicle on the public roads while the application for registration is being completed. The permit, which is always red, displays a large, boldface number in white, indicating that the vehicle may be lawfully operated until the last day of the corresponding month. Other information on the permit specifies, among other things, the make of the vehicle, the license plate number, the vehicle identification number (VIN), and the applicable year. An officer would not be able to determine whether the sticker is for the current year, or whether it is associated with the particular vehicle, without stopping the vehicle and verifying the information on the sticker.

Defendant's motion to suppress argued that the initial traffic stop was unlawful; that if the seizure of his person began only when Officer Womack took possession of his driver's license, it too was unlawful; that the traffic stop, even if lawful, was unreasonably prolonged; and that the patsearch was unlawful. The trial court denied the motion, finding that the officer was justified in making a traffic stop to investigate the apparent violation of Vehicle Code section 5200, which requires a vehicle to have two license plates; that the officer had a right to ask the driver for identification; and that the officer had ample concern for his safety to justify the patsearch of defendant.

Following the denial of the motion to suppress, defendant pleaded guilty as charged and admitted a prior strike conviction. At sentencing, the trial court exercised its discretion under Penal Code section 1385 to dismiss the strike and placed defendant on probation for three years, with the condition that defendant serve six months in jail and not associate with motorcycle gangs.

The Court of Appeal affirmed the judgment. It found that the Fourth Amendment rights of defendant, as a passenger, were not infringed by the traffic stop; that the traffic stop was in any event justified by the missing front license plate and the expired registration tab; that the traffic stop was not unlawfully prolonged; and that the officer's concern that defendant might be concealing a weapon justified the patsearch. We granted review, limited to (1) whether defendant, as a passenger in a vehicle subjected to a traffic stop, was seized within the meaning of the Fourth Amendment; and (2) whether reasonable suspicion of Vehicle Code violations relating to the missing front license plate and the expired registration tab could exist where the pickup also displayed a current temporary operating permit.

DISCUSSION

In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine

whether the law as applied has been violated. We review the court's resolution of the factual inquiry under the deferential substantial-evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review. (*People v. Brendlin* (2006) 38 Cal.4th 1107, 1113–1114 (*Brendlin*).) In this case, the facts are largely undisputed.

During a patsearch following a traffic stop of a pickup in which defendant was a passenger, the police discovered a loaded semiautomatic firearm in defendant's jacket pocket. The police also found ammunition on the passenger-side floorboard of the truck. Defendant seeks suppression of the evidence seized from his person and the vehicle in which he was riding, asserting that the traffic stop was not supported by reasonable suspicion. The Attorney General responds that we need not consider whether the traffic stop was justified because defendant, as a passenger in the vehicle, was not seized within the meaning of the Fourth Amendment when the driver submitted to the show of police authority.

■ The Attorney General correctly describes defendant's status at the inception of the traffic stop. As explained in *Brendlin, supra,* 38 Cal.4th at page 1111, a mere passenger in a vehicle is not seized when a police officer initiates a traffic stop absent additional circumstances that would indicate to a reasonable person that he or she was the subject of the peace officer's investigation or show of authority. Here, as in *Brendlin,* the officer effecting the traffic stop took no actions that would have indicated to defendant that he was the subject of the officer's show of authority or investigation at the time the driver, Roosevelt Ingram, pulled over.

■ Our analysis, however, cannot stop there, for defendant argues that even if he was not seized at the outset, a seizure occurred when Officer Womack approached the passenger side of the vehicle, asked defendant for his identification, handed the license to Officer Acosta (who retained it to perform a radio check), and then ordered defendant to exit the vehicle. (See *People v. Arteaga* (1995) 274 Ill.App.3d 781 [655 N.E.2d 290, 291–292, 211 Ill.Dec. 387].) The Attorney General responds that because defendant was free to leave when the truck came to a stop, his interaction with Officer Womack must be viewed as a consensual encounter. (See *People v. Cartwright* (1999) 72 Cal.App.4th 1362, 1370 [85 Cal.Rptr.2d 788]; *State v. Gulick* (2000) 2000 ME 170 [759 A.2d 1085, 1088].) Yet, even assuming the officer's conversation with defendant were deemed a consensual encounter, defendant was unquestionably seized when the officer ordered him to step out of the truck. Under *Maryland v. Wilson* (1997) 519 U.S. 408 [137 L.Ed.2d 41, 117 S.Ct. 882], an officer's authority to order a passenger to exit a vehicle during a traffic stop as a matter of course is limited to those vehicles that are

"lawfully stopped." (*Id.* at p. 410.) To uphold this seizure, then, the People must demonstrate that the underlying traffic stop was lawful.

■ "[P]ersons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers." (*Delaware v. Prouse* (1979) 440 U.S. 648, 663 [59 L.Ed.2d 660, 99 S.Ct. 1391].) However, when there is articulable and reasonable suspicion that a motorist is unlicensed, that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, the vehicle may be stopped and the driver detained in order to check his or her driver's license and the vehicle's registration. (*Ibid.*; see *Pennsylvania v. Mimms* (1977) 434 U.S. 106, 109 [54 L.Ed.2d 331, 98 S.Ct. 330] [expired registration tags justified traffic stop].)

In this case, Officer Womack observed that the registration tab on the pickup's rear license plate had expired. This appeared to be a violation of Vehicle Code section 4000, subdivision (a)(1), which requires the vehicle be currently registered; Vehicle Code section 4601, subdivision (a), which requires the vehicle's registration be renewed annually prior to the expiration of the registration year; and Vehicle Code section 5204, subdivision (a), which requires current registration tabs to be displayed on the rear license plate. (See *People v. James* (1969) 1 Cal.App.3d 645, 648 [81 Cal.Rptr. 845].) Defendant argues that the officer's belief the pickup was in violation of these provisions was rebutted *prior to the stop* by the officer's observation of a temporary operating permit sticker, which was affixed to the upper right corner of the rear window. The sticker bore a large number "3," which corresponded to the month of March. In defendant's view, the stop was therefore unjustified because Officer Womack had no articulable facts supporting a suspicion the sticker was invalid. (See Veh. Code, §§ 4156, 5202.)

The Attorney General responds that the expired registration tab on the license plate itself established articulable facts supporting the officer's suspicion the vehicle was unregistered. The temporary sticker, he continues, was insufficient to rebut that suspicion because, as the DMV clerk testified, it would not be possible to determine whether the sticker was for the current year or was even associated with this vehicle without stopping the vehicle and examining the sticker against the VIN.

■ We have not yet decided whether an officer may stop a vehicle that has an expired registration tab but also displays a temporary operating permit. Some courts hold that the Fourth Amendment bars an officer from effecting a traffic stop in these circumstances. (E.g., *State v. Childs* (1993) 242 Neb. 426 [495 N.W.2d 475, 481–482]; *State v. Butler* (Ct.App. 2000) 343 S.C. 198 [539 S.E.2d 414, 416–418].) In other cases, the court or the defendant has

assumed that a traffic stop limited to the purpose of verifying the validity of the temporary permit is consistent with the Fourth Amendment. (E.g., *U.S. v. McSwain* (10th Cir. 1994) 29 F.3d 558, 561; *State v. Diaz* (Fla. 2003) 850 So.2d 435, 437.) We need not decide the issue, however, because Officer Womack *also* noticed that the pickup's front license plate was missing. As defendant acknowledges, the lack of a front license plate has long been recognized as a legitimate basis for a traffic stop. (*People v. Superior Court (Simon)* (1972) 7 Cal.3d 186, 196 [101 Cal.Rptr. 837, 496 P.2d 1205]; *People v. Lee* (1968) 260 Cal.App.2d 836, 839 [67 Cal.Rptr. 709]; *People v. Odegard* (1962) 203 Cal.App.2d 427, 431 [21 Cal.Rptr. 515]; see Veh. Code, § 5200.)

Defendant offers two reasons for disallowing a traffic stop based on Vehicle Code section 5200 in this case. Neither is persuasive.

Defendant points out first that a front license plate is required only "[w]hen two license plates are issued by the department" (Veh. Code, § 5200), implying that only one plate had been issued to Ingram's vehicle. But defendant offers no reason why that vehicle, a seemingly ordinary pickup truck, would have been issued only one license plate (cf. *U.S. v. Ramstad* (10th Cir. 2002) 308 F.3d 1139, 1146), and Ingram's testimony, which indicated that he was going to receive his "plates" when he had finished the registration process, suggests that the vehicle must have been issued two plates. More importantly, defendant fails to explain why an officer observing the pickup truck with a missing front license plate would have had no basis for believing two plates had been issued.

Defendant then cites Vehicle Code section 5202, which provides that "[s]pecial permits issued in lieu of plates shall be attached and displayed on the vehicle for which issued during the period of their validity." In defendant's view, the temporary operating permit displayed on the rear window applied not only to his expired registration but also to the missing license plate and thus, he argues, "the vehicle in which he was riding was in full compliance with the law at the time the police stopped it." The question for us, though, is not whether Ingram's vehicle was in fact in full compliance with the law at the time of the stop, but whether Officer Womack had " 'articulable suspicion' " it was not. (*People v. Celis* (2004) 33 Cal.4th 667, 674 [16 Cal.Rptr.3d 85, 93 P.3d 1027]; see generally *Illinois v. Rodriguez* (1990) 497 U.S. 177, 184 [111 L.Ed.2d 148, 110 S.Ct. 2793] [" 'reasonableness,' with respect to this necessary element, does not demand that the government be factually correct in its assessment"].) The possibility of an innocent explanation for a missing front license plate does not preclude an officer from effecting a stop to investigate the ambiguity. (See *Illinois v. Wardlow* (2000) 528 U.S. 119, 125–126 [145 L.Ed.2d 570, 120 S.Ct. 673];

accord, *People v. Leyba* (1981) 29 Cal.3d 591, 599 [174 Cal.Rptr. 867, 629 P.2d 961].) Here, Officer Womack had no ready means, short of a traffic stop, of investigating whether the temporary operating permit applied only to the expired registration or extended as well to the missing license plate.[1] The license plate, after all, could have gone missing *after* Ingram had obtained the temporary permit. Moreover, the officer's suspicion that the vehicle was in violation of section 5200 was supported by the DMV procedures for replacing lost, stolen, or mutilated plates. Under those procedures, a registered owner must surrender or mail in "the remaining plate(s)." (DMV, Obtain Duplicate or Substitute License Plates and Stickers <http://www.dmv.ca.gov/pubs/brochures/howto/htvr11.htm> [as of June 29, 2006].) Yet, as both parties testified, the pickup still displayed its rear license plate, which supported the inference that the registered owner had *not* initiated the process of replacing the missing plate. We therefore conclude that Officer Womack had ample justification for ordering a traffic stop to investigate the missing license plate.

Once the pickup had lawfully been stopped, the police were entitled to demand the driver's license and registration. (Veh. Code, §§ 4462, subd. (a), 12951, subd. (b); *In re Arturo D.* (2002) 27 Cal.4th 60, 67 [115 Cal.Rptr.2d 581, 38 P.3d 433]; *id.* at pp. 88–89 (conc. & dis. opn. of Werdegar, J.).) It was at that point that the officers discovered that Ingram's license had been suspended, decided to impound the truck pursuant to department policy, ordered the occupants out of the vehicle, and conducted the patsearch of defendant's person. Those actions were found proper by the superior court and the Court of Appeal, and are beyond the scope of our grant of review. Accordingly, our conclusion that the traffic stop was supported by reasonable suspicion of one or more Vehicle Code violations is sufficient to affirm the denial of defendant's motion to suppress.

DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., and Chin, J., concurred.

---

[1] Officer Womack apparently did not perform a radio check of the pickup's registration, but such an effort would have been futile in this case. Connie Gonzalez, the DMV representative, testified that Ingram's permit was not entered into any computer database and that an officer would have to stop the vehicle to verify its validity and scope. This case is thus distinguishable from *Brendlin, supra,* 38 Cal.4th at page 1114, in which the deputy was able to verify the vehicle's registration status by means of a radio inquiry, and from *People v. Nabong* (2004) 115 Cal.App.4th Supp. 1, 4 [9 Cal.Rptr.3d 854], in which no evidence was offered as to whether the officer called his department for a registration check "and if he did not, why he did not."

**CORRIGAN, J.**, Concurring.—I concur in the judgment; I agree with the majority that, regardless of the expired registration tab and the temporary operating permit, the missing license plate justified the traffic stop in this case.

I write separately to note my disagreement with the proposition that Saunders, as a passenger, was not detained at the inception of the stop. (Maj. opn., *ante*, p. 1134.) I would hold that Saunders was detained at that point; he had been deprived of his freedom of movement and was subject to the officers' control. (See *People v. Brendlin* (2006) 38 Cal.4th 1107 (dis. opn. of Corrigan, J.).)

Werdegar, J., and Moreno, J., concurred.

On July 26, 2006, the opinion was modified to read as printed above.