[No. B184948. Second Dist., Div. Three. Nov. 9, 2006.]

In re CARLEISHA P., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
CARLEISHA P., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication. the portions of this opinion to be deleted from publication are those portions enclosed within double brackets, [[]].

**COUNSEL**

Lynette Gladd Moore, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—In the published portion of this opinion, we address an issue of first impression and hold that Penal Code section 12101, subdivision (b)[1] (possession of live ammunition by minor) is violated only once by a minor who simultaneously possesses three different types of ammunition. In the unpublished portion of this opinion, we hold there was sufficient evidence to support the juvenile court's finding the minor was holding the ammunition for the benefit of a criminal street gang.

The minor, Carleisha P., was declared a ward of the juvenile court, pursuant to Welfare and Institutions Code section 602. The petition was sustained after the juvenile court found true three allegations that Carleisha had been in possession of live ammunition (§ 12101, subd. (b)). The juvenile court also found true allegations that Carleisha had been holding this ammunition for the benefit of a criminal street gang (§ 186.22, subd. (b)).

The judgment is affirmed in part and reversed in part.

### BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103], the evidence established the following.

### 1. *Prosecution evidence.*

Los Angeles Police Officer Brian Coleman was assigned to a gang enforcement unit. On May 8, 2005, he and his partner were patrolling near 55th Street and Budlong Avenue. This was an area claimed by the Five Deuce Hoovers, a gang also known as the 52 Hoovers. The officers saw Carleisha standing on the sidewalk, wearing an orange long-sleeved shirt underneath a white T-shirt. The 52 Hoovers identify with the color orange. A few days earlier, Coleman had learned Carleisha was on probation and had an outstanding warrant. Coleman and his partner arrested Carleisha on the warrant. She told them "she was a Rolling 60 Neighborhood Crip member with a moniker of La-La Blue." Asked if Carleisha had mentioned "any other association with gangs," Coleman testified, "She stated that she had family that associated with the Five Deuce Hoovers and that she [lives] in that area."

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

Coleman contacted Carleisha's probation officer, who verified she had a gang search condition attached to her probation. The police officers then went to Carleisha's house, which was just down the block. There, Carleisha's mother directed the officers to the bedroom Carleisha shared with two sisters. On the top shelf of the bedroom closet, officers found a .30-caliber M-1 rifle. Next to it was a rifle magazine containing .30-caliber bullets. Also on the closet shelf was a small baggie containing two .38-caliber bullets and one .357-caliber bullet. Inside the same closet, police found several items of orange clothing, as well as a pair of orange and blue tennis shoes.

On a door leading from this bedroom into a bathroom, police found a laminated Miller Genuine Draft wall poster, on the back of which there was gang graffiti. The graffiti contained a positive reference to the 52 Hoovers and negative references to various other gangs. Coleman testified the negative references "included the number 40 crossed out with a 'K' at the end and '55K,' crossed out, '58K' crossed out and I believe '60K' crossed out. [¶] Q And what does that signify? [¶] A Through my training and experience and seeing numerous [*sic*] gang graffiti, it represents 40 Killer, 55 Neighborhood Crip Killer, 58 Neighborhood Crip Killer and Rolling Sixties Neighborhood Crip Killer." Coleman explained the significance of the cross-outs: "It's a derogatory writing . . . meaning that they don't approve of that gang or their rival gang and these gangs are rival gangs in the area neighboring the Five Deuce Hoovers."

Coleman testified the "Hoovers are a type of Crip gang," but that "Neighborhood Crips and Hoovers generally do not get along . . . ." He had seen situations in which "people [who] have lived in two different areas have associated with one gang and moved to a new area . . . controlled by another gang, and they . . . started associating with the new gang in the new neighborhood that they live in. [¶] And also if they have family members that are from a different gang, they might be rivals, but as family members, they still associate with one another."

Detective Andrew Paredes testified he had been working the gang detail for the last five years. Specifically, he had been assigned to work on the Hoover sets, one of which was the 52 Hoovers. He described the usual gang participants as including: (1) "an O.G.," who is "a person that's in charge that puts in his work that's been in the gang for a while, meaning years, usually older"; (2) "soldiers," who "put in the work for the gang, meaning dealing the drugs, carrying the weapons"; and (3) "associates" who, while not actual members of the gang, "hang out with the gang" and assist "the other gang

members by hiding stuff [and] by committing crimes." Asked, "Now, this particular gang, 52 Hoover, what types of crimes do you know them to commit?", Paredes testified: "They commit a lot of crimes. They commit crimes for [*sic*] murder, drive-by shootings, robberies, kidnappings, shoot [*sic*] robberies, bank robberies, weapons violations."

The prosecutor then asked Paredes a hypothetical question:

"Q Now, let me pose a series of facts to you, and I'd like to get your opinion regarding those facts. [¶] If there's an associate of the Hoovers, a person who admits to be an associate of the 52 Hoover gang and they keep an assault rifle . . . in their closet in their bedroom, would you have an opinion as to what that person is having that rifle in their closet for?

"A Yes.

"Q And what would your opinion be?

"A My opinion, where an individual is an associate, basically they're putting in work for the gang. They're trying to become gang members; so in this way, they'll put work in. [¶] The other gang members will use this individual by giving them the guns to store the guns, to hide the guns, hide narcotics. So they have these weapons for their enterprise, their protection.

"Q Let me put one additional fact in there. [¶] Specifically if the associate is a female, would that add to the equation?

"A Yes.

"Q How?

"A Basically, these gang members out there use these females if it isn't for using them for sex, they're using them to hide narcotics, to hide weapons. So a lot of times, when we stop them out there, the females will have narcotics on them or they'll have guns. There's certain places that we can't search them and then there might not be a female out there to assist us to search them.

"Q And would it be your opinion that . . . the person who [had the] assault rifle in their bedroom[] . . . let's say you take also the fact that besides this person admitting they're an associate, that they also have a—let me show you this poster, People's 3A, that poster represents gang—any type of gang involvement?

"A Yes, it is.

"Q Can you tell us what would your opinion be regarding that poster?

"A In my opinion . . . if this individual had this, this person is definitely a gang member, because basically what it is, it's telling me you got the Hoover sign with the index middle finger showing the 'H.' You got the rival gang being crossed out, 40 Killer, Five Killer, Five Eight Killer, 60 Killer, you got all—all their enemies they got crossed out.

"Q Now, if that was also found in . . . the room[,] along with the admission and this weapon, would you have an opinion as to what this weapon was possessed for?

"A In my opinion, weapon[']s being possessed for the gang, individual's storing the gun or the rifle in their closet . . . in furtherance of the gang to sell their narcotics, to have protection for rival gang members or if . . . they're going to go do a drive-by shooting at a rival gang."

Paredes testified he had experience dealing with both the 52 Hoovers and the Rolling 60 Neighborhood Crips, and that the two gangs are "supposed to be" enemies. Asked, "[I]f someone was . . . a Neighborhood Crip and they move into 52 Hoover territory, . . . if those individuals had family members who are also 52 Hoover, is it uncommon for them to associate with 52 Hoover since they live in their territory and have family members that are also from that set?", Paredes testified: "That's a common thing, yes."

The prosecution put into evidence two minute orders showing prior convictions sustained by two persons, Carl Lynks and Troy Washington. Lynks had been convicted of assault with a deadly weapon in May 2002; Washington had been convicted of voluntary manslaughter in March 2004. Paredes testified he was familiar with these men and that they were both Five Deuce Hoover gang members.

2. *Defense evidence.*

One of Carleisha's sisters testified she had seen the Miller beer poster in their bedroom. The poster did not belong to Carleisha; a visitor to their house had left it behind about eight months before police found it. She never saw the poster hanging up on the bathroom door: "No, it was never hanging anywhere. It was always rolled up . . . ." The sister also testified she had never before seen the rifle police found in the bedroom closet.

### 3. *Juvenile court's findings.*

The juvenile petition alleged in count 1 that Carleisha had been in possession of an assault weapon in violation of section 12280, and it alleged in counts 2 through 4 that she had been in possession of live ammunition in violation of section 12101. The petition further alleged Carleisha had committed these acts for the benefit of a criminal street gang. The juvenile court concluded Carleisha had been in possession of the gun found in her bedroom, but that there was insufficient evidence to prove the gun was an assault weapon. Accordingly, the juvenile court dismissed count 1 of the petition. The juvenile court found there was sufficient evidence to prove Carleisha had committed three violations of section 12101, subdivision (b)(1), because she was in possession of three different kinds of live ammunition. The juvenile court also found Carleisha had been holding this ammunition for the benefit of the 52 Hoovers.

## CONTENTIONS

1. There was insufficient evidence to prove the gang enhancement.

2. Carleisha violated section 12101, subdivision (b), once, not three times.

## DISCUSSION*
[[. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .]]

### 2. *Multiple convictions for possessing three kinds of live "ammunition" were improper.*

Carleisha contends that, by finding she had committed three violations of section 12101, subdivision (b) (minor in possession of live ammunition), the juvenile court improperly split a single offense into multiple crimes. We conclude this claim has merit.

Section 12101, subdivision (b), provides, in its entirety: "(1) A minor shall not possess live ammunition. [¶] (2) Paragraph (1) shall not apply if one of the following circumstances exists: [¶] (A) The minor has the written consent of his or her parent or legal guardian to possess live ammunition. [¶] (B) The minor is accompanied by his or her parent or legal guardian. [¶] (C) The minor is actively engaged in, or is going to or from, a lawful, recreational

---

*See footnote, *ante,* page 912.

sport, including, but not limited to, competitive shooting, or agricultural, ranching, or hunting activity, the nature of which involves the use of a firearm."

Carleisha contends her simultaneous possession of more than one bullet constituted only a single violation of this statute. The Attorney General contends there were three violations because Carleisha was in possession of three different *types* of ammunition: the .38-caliber and .357-caliber bullets found in the plastic bag, and the .30-caliber bullets found in the rifle magazine.

█ This issue presents a question of first impression regarding the appropriate unit of prosecution under section 12101, subdivision (b). "A single crime cannot be fragmented into more than one offense. [Citation.]" (*People v. Rouser* (1997) 59 Cal.App.4th 1065, 1073 [69 Cal.Rptr.2d 563]; see, e.g., *People v. Lyons* (1958) 50 Cal.2d 245, 275 [324 P.2d 556], disapproved on other grounds by *People v. Green* (1980) 27 Cal.3d 1, 32 [164 Cal.Rptr. 1, 609 P.2d 468] [defendant committed crime of receiving stolen property only once where he received watch and fur coat at same time, even though items had been stolen from different victims].)

The Attorney General argues the result here should be the same as the result in drug cases, where the simultaneous possession of different kinds of illegal drugs properly results in multiple convictions. The Attorney General cites the well-established rule that "possession of narcotics under different classifications of the Health and Safety Code may be charged and punished as separate crimes notwithstanding a simultaneous possession constituting but one transaction." (*People v. Schroeder* (1968) 264 Cal.App.2d 217, 228 [70 Cal.Rptr. 491] [defendant properly convicted separately for possessing morphine and opium]; see also *People v. Seaberry* (1968) 260 Cal.App.2d 507, 508 [510, 67 Cal.Rptr. 182] [defendant committed "two violations of [former] Health and Safety Code, section 11911, for possessing for purpose of sale two restricted dangerous drugs, seconal and Benzedrine" because these "are different and distinct types of drugs"]; *People v. Lockwood* (1967) 253 Cal.App.2d 75, 82–83 [61 Cal.Rptr. 131] [defendant's simultaneous possession of codeine and opium properly resulted in two convictions for violating former Health and Safety Code section 11500]; *People v. Lopez* (1959) 169 Cal.App.2d 344, 351 [337 P.2d 570] [defendant's "possession of each of the three different and distinct types of narcotics [heroin, marijuana and amidone], even at the same time, constituted three separate offenses"].)

But the result in these drug cases depends on the fact the drug statutes themselves classify prohibited drugs by types. That is, multiple convictions are proper because individual drug statutes enumerate and proscribe multiple kinds of illegal drugs. (See, e.g., Health & Saf. Code, §§ 11054, 11055, 11056.) Unlike these drug statutes, however, section 12101, subdivision (b), only proscribes the possession of "live ammunition" without making any further classification. And the Legislature has certainly demonstrated elsewhere that further classifications could be made. (See, e.g., § 666.7, subd. (j)(1) ["ammunition . . . designed primarily to penetrate metal or armor"]; § 12020, subd. (a)(1) ["any ammunition which contains or consists of any flechette dart"]; § 12020, subd. (b)(6) ["Tracer ammunition manufactured for use in shotguns."]; § 12316, subd. (a)(1)(A) ["reloaded ammunition"]; § 12301, subd. (a)(1) ["tracer or incendiary ammunition"]; § 12320 ["handgun ammunition designed primarily to penetrate metal or armor"]; § 12581 [" 'Blowgun ammunition' "]; § 12601, subd. (b)(10) ["industrial ammunition"]; Health & Saf. Code, § 12001, subd. (b) ["[s]mall arms ammunition of .75 caliber or less"].)

Carleisha argues the word " '[a]mmunition' is a noun that by its nature embraces the plural," and therefore "the simultaneous possession of three live rounds can only give rise to one violation of the statute." The Attorney General disagrees: "[A]ppellant's argument on statutory construction is unconvincing because, contrary to her assertion, *'ammunition' does not 'by its nature embrace the plural.'* The Wikipedia Encyclopedia states that 'ammunition' is a 'generic military term meaning (the assembly of) a projectile and its propellant.' Hence, *one bullet can be 'ammunition.'* Because appellant was in possession of three different types of bullets, or three different types of ammunition, she was properly charged and convicted of three violations of section 12101, subdivision (b)(1)." (Italics added.)

But the question is not whether "ammunition" *can* mean a single bullet. Carleisha does not claim otherwise. Rather, she is arguing the word means *both* one bullet *and* more than one bullet; i.e., that although "ammunition" is a grammatically singular noun, it embraces *both* singular and plural meanings. The relevant question, therefore, is whether the Attorney General is correct in asserting the word "ammunition" does not inherently embrace the plural. We conclude, based on our analyses of the word's definition and grammar, its common usage and its legislative usage, that the Attorney General is wrong.

The ordinary dictionary definition of "ammunition" includes the plural. (See American Heritage Dict. (4th ed. 2000) <http://www.bartleby.com> [as of Nov. 9, 2006] ["Projectiles, such as bullets and shot, together with their fuses and primers, that can be fired from guns or otherwise propelled."];

Oxford Dict. of Current English (rev. 2d ed. 1996) p. 24 ["supply of bullets, shells, grenades, etc."]; Merriam-Webster Dict. OnLine <http://www.m-w.com/dictionary> [as of Nov. 9, 2006] ["the projectiles with their fuses, propelling charges, or primers fired from guns," "cartridges," "explosive military items (as grenades or bombs)"]; Webster's Collegiate Dict. (5th ed. 1946) p. 35 ["projectiles thrown against an enemy, such as bullets, shells, grenades, and bombs, with their necessary propellants, detonators, fuses, and primers"].)

In terms of grammar, "ammunition" is a "mass noun,"[4] as distinguished from a "count noun." According to the University of Illinois's Writers' Workshop Grammar Handbook (<http://www.english.uiuc.edu/cws/wworkshop> [as of Nov. 9, 2006]): "Every noun can . . . be distinguished as count or mass," and while count nouns "can be quantified or counted with a number," mass nouns cannot. Thus, count nouns "have singular and plural forms," "can use a, an, or one as a modifier," and "can use 'many' as a modifier." Mass nouns, on the other hand, "are uncountable by a number" and have to be "quantified by a word that signifies amount," which is why it is incorrect to say "four woods, one rice, three courages." "To measure or classify mass nouns [a speaker must] use 'of' after a measurement: a foot of wood, a pound of rice, an ounce of courage, a bar of chocolate, a piece of music, a bag of money."[5]

Our Supreme Court regularly uses the word "ammunition" in a way that embraces both the singular and the plural, adding a measurement word if the context calls for quantification. (See *People v. Saunders* (2006) 38 Cal.4th 1129, 1131 [45 Cal.Rptr.3d 66, 136 P.3d 859] ["members of the Hell's Angels were arrested for possession of automatic weapons and ammunition"]; *People v. Avila* (2006) 38 Cal.4th 491, 507 [43 Cal.Rptr.3d 1, 133 P.3d 1076] ["deputies also found numerous firearms and various calibers of ammunition"]; *People v. Robinson* (2005) 37 Cal.4th 592, 598 [36 Cal.Rptr.3d 760, 124 P.3d 363] ["He testified that he purchased the firearm because previously at the practice range he had been forced to rent expensive guns for which ammunition also was quite costly, and he wanted instead to have a simple and serviceable gun that would use less expensive ammunition."]; *People v. Harris* (2005) 37 Cal.4th 310, 356 [33 Cal.Rptr.3d 509, 118 P.3d 545] ["each one of

---

[4] Merriam-Webster defines "mass noun" as "a noun (as *sand* or *water*) that characteristically denotes in many languages a homogeneous substance or a concept without subdivisions and that in English is preceded in indefinite singular constructions by *some* rather than *a* or *an* . . . ." (Merriam-Webster Dict. OnLine <http://www.m-w.com/dictionary> [as of Nov. 9, 2006].)

[5] Although the Attorney General cites a Wikipedia entry in support of his argument the word "ammunition" denotes the singular rather than the plural, he fails to mention that the Wiktionary (<http://en.wiktionary.org/wiki> [as of Nov. 9, 2006]), a sister project of the Wikipedia, defines "ammunition" as an uncountable noun meaning "1. Articles used in charging firearms and ordnance of all kinds; as powder, balls, shot, shells, percussion caps, rockets, etc. [¶] 2. Any stock of missiles, literal or figurative."

their votes was akin to a live round of ammunition shot by a firing squad"]; *People v. Schmeck* (2005) 37 Cal.4th 240, 253 [33 Cal.Rptr.3d 397, 118 P.3d 451] ["a bag with six .22-caliber rounds of live ammunition"]; (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1119 [23 Cal.Rptr.3d 295, 104 P.3d 98] ["154 rounds of various brands of nine-millimeter ammunition"]; see also *U.S. v. Cardoza* (1st Cir. 1997) 129 F.3d 6, 10 ["courts, and the public generally, refer to ammunition in terms of 'rounds,' " giving as examples " 'six rounds of ammunition' " and " 'a single round of .22 caliber ammunition' "].)

The Legislature has also used the word "ammunition" to mean both one and more than one bullet. (See, e.g., § 189 [first degree murder includes murder "perpetrated by means of . . . ammunition designed primarily to penetrate metal or armor"]; Civ. Code, § 1714, subd. (a) ["design, distribution, or marketing of firearms and ammunition is not exempt from the duty to use ordinary care and skill"]; Fish & G. Code, § 2010 ["the commission may . . . adopt regulations relative to the ammunition capacity of shotguns for taking mammals or birds"]; Fish & G. Code, § 4181.5 ["Rifle ammunition used shall have expanding bullets; shotgun ammunition shall have only single slugs."]; Gov. Code, § 50081, subd. (a) ["local agency shall furnish each newly hired police officer . . . with a service revolver or other suitable pistol, holster, belt and ammunition"]; Gov. Code, § 69927, subd. (a)(4) ["costs of ammunition, batons, bulletproof vests, handcuffs, holsters, . . . uniforms, and one primary duty sidearm"].)

The Legislature's use of "ammunition" in section 12101, subdivision (b), appears to be consistent with this practice. One of the few decisions to construe this statute is *In re Khamphouy S.* (1993) 12 Cal.App.4th 1130 [15 Cal.Rptr.2d 882]. In the course of finding sufficient evidence to prove that ammunition found in the minor's possession was "live," *Khamphouy S.* had this to say: " 'Live ammunition' as contemplated by the Legislature under this statute consists of any material (i.e., projectiles, shells, or bullets) in the present state of being capable of being fired or detonated from a pistol, revolver or any firearm. [Citations.]" (*Id.* at p. 1134.)

In subdivision (b)(2) of section 12101, the Legislature set forth exceptions to the prohibition on possessing live ammunition. One exception arises if the minor has "written consent" from a parent or guardian "to possess live ammunition" (§ 12101, subd. (b)(2)(A)). We doubt the Legislature thought minors were going to get written permission to possess only a single bullet. Another exception arises if the minor "is actively engaged in . . . a lawful, recreational sport, including, but not limited to, competitive shooting, or agricultural, ranching, or hunting activity, the nature of which involves the use of a firearm" (§ 12101, subd. (b)(2)(C)). We doubt the Legislature

thought a competitive shooting event or a hunting trip would involve only single bullets. Carleisha's reading of subdivision (b)(1) is consistent with the apparent meaning of subdivision (b)(2).

■ In sum, we conclude that, consistent with its technical meaning, ordinary usage and general legislative usage, the word "ammunition" in section 12101, subdivision (b), prohibits the possession of *any quantity* of live ammunition.[6] Hence, a minor's possession of one or more bullets, whether of the same or different types, constitutes only a single offense.

### 3. *Rule of lenity applicable.*

■ Even if we were not confident in this conclusion, we would hold the statute was at least ambiguous on this point and apply the rule of lenity in Carleisha's favor. "When . . . the language of a penal law is reasonably susceptible of two interpretations, we construe the law 'as favorably to criminal defendants as reasonably permitted by the statutory language and circumstances of the application of the particular law at issue.' [Citations.] This 'protects the individual against arbitrary discretion by officials and judges and guards against judicial usurpation of the legislative function which would result from enforcement of penalties when the legislative branch did not clearly prescribe them.' [Citation.]" (*People v. Robles* (2000) 23 Cal.4th 1106, 1115 [99 Cal.Rptr.2d 120, 5 P.3d 176]; see also *People v. Gardeley* (1996) 14 Cal.4th 605, 622 [59 Cal.Rptr.2d 356, 927 P.2d 713] ["Although it is the policy of this state to have courts construe penal laws as favorably to criminal defendants as reasonably permitted by the statutory language and circumstances of the application of the particular law at issue [citations], that policy generally comes into play only when the language of the penal law 'is susceptible of two constructions'. . . ."].)

Applying the rule of lenity, we would hold that, because the proper unit of prosecution under section 12101, subdivision (b), is ambiguous, Carleisha's conduct violated the statute only once. Hence, we agree with Carleisha that the juvenile court improperly found she violated section 12101 three times because the evidence showed she violated the statute only once.[7]

---

[6] We are not persuaded otherwise by *United States v. Gann* (9th Cir. 1984) 732 F.2d 714, a case cited by the Attorney General. In that case, separate charges were proper because the "different types of ammunition . . . were received at different times and stored in different places . . . ." (*Id.* at p. 721.) The evidence in this case was quite different.

[7] Given this result, we need not reach Carleisha's alternative contention the trial court violated section 654 by punishing her for three violations of section 12101.

## DISPOSITION

The judgment is affirmed in part and reversed in part. We reverse two of the findings that Carleisha violated section 12101, but we affirm the third such finding. We also affirm the finding that she violated this statute for the benefit of a criminal street gang. We remand this case to the juvenile court for further proceedings consistent with this opinion.

Croskey, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 14, 2007, S148650.