Filed 3/11/16  P. v. Aguilar CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066745 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN330170) |
| MARTIN AGUILAR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard Monroy and Sim Von Kalinowski, Judges.  Affirmed.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

United States Border Patrol (Border Patrol) agents initiated a traffic stop near the San Clemente Border Patrol checkpoint after they became suspicious that Martin Aguilar was engaged in conduct common for drug smugglers. After Aguilar consented to a search of the vehicle, agents found approximately 185 pounds of methamphetamine packed into compartments in the vehicle.

A jury found Aguilar guilty of transportation of a controlled substance (Health & Saf. Code, § 11379, subd. (a); count 1), possession for sale of a controlled substance (Health & Saf. Code, §11378; count 2), and using a false compartment to smuggle a controlled substance (Health & Saf. Code, § 11366.8, subd. (a); count 3). The jury found true allegations the amount of methamphetamine involved in counts 1 and 2 exceeded 20 kilograms by weight (Health & Saf. Code, § 11370.4, subd. (b)(4)). The court sentenced Aguilar to 17 years in prison based on the low term of two years for count 1 plus 15 years for the large volume enhancement under Health and Safety Code section 11370.4, subdivision (b)(4). Pursuant to Penal Code section 654, the court stayed punishment for count 2 (the low term of 16 months plus the 15-year enhancement) and count 3 (the low term of 16 months).

Aguilar appeals contending (1) the trial court erred in denying his motion to suppress the evidence found during the vehicle search because a "collective hunch" rather than reasonable suspicion prompted the traffic stop; and (2) the court abused its discretion in denying his motion for mistrial after a prosecution witness mentioned

2

Aguilar had "an alert" after the court excluded this information. Finding no merit in either of these contentions, we affirm the judgment.

FACTUAL BACKGROUND

Interstate 5 (I-5) is a known smuggling corridor. It is common for alien and narcotic smugglers to stop at the Aliso Creek rest area on north I-5 to avoid going through the Border Patrol checkpoint when it is in operation. Smugglers stop at the rest area while scouts driving in other vehicles proceed through the checkpoint to determine its status. The scouts then report back to the smugglers waiting in the rest area.

On the afternoon of March 18, 2014, since the checkpoint had been opening and closing all day, Border Patrol Agent Christopher Naranjo was patrolling the rest area in a marked patrol vehicle looking for smugglers who may have stopped in an attempt to avoid the checkpoint. Naranjo observed a 2002 gold Mazda Tribute with a newer license plate parked in the rest area. This was significant because, in his experience, smugglers replate and reregister vehicles "in an attempt to remove any derogatory information from the vehicle," such as an alert for the vehicle.

Agent Naranjo observed a single male, whom he identified as Aguilar, sitting in the vehicle with his mirrors positioned to observe cars as they passed behind him. The agent noticed Aguilar shifted around in his seat to watch the patrol vehicle as it passed. Naranjo found this unusual since people in the rest area are typically eating, texting, or sleeping rather than being focused on traffic behind them.

Agent Naranjo ran a records check on the license plate and learned it crossed the border earlier in the day through the Tecate port of entry with a single person, Aguilar.

3

He was able to view a photograph of the vehicle crossing the border at 10:46 a.m. Naranjo, who encountered the vehicle in the rest area at approximately 1:15 p.m., noted there was a lapse of time between when the vehicle crossed the border and when he encountered the vehicle. Having seen vehicles cross the border and be loaded with contraband on the United States side, he thought something like this may have happened.

At the motion to suppress hearing, Agent Naranjo testified he requested more information about Aguilar and learned Aguilar had an alert associated with his name, which led Naranjo to believe Aguilar may be involved in narcotics smuggling. Although Naranjo did not testify regarding the substance of the alert associated with Aguilar, he stated generally an alert is an indication the individual may be involved with some sort of criminal activity.

By the time Agent Naranjo received the additional information regarding Aguilar, he was on the other side of the freeway to assist another agent. Knowing the checkpoint was nonoperational, he radioed other agents on his team and asked them to look for the vehicle in the rest area. However, when those agents drove through the rest area, the vehicle was gone. They radioed their supervisor who was parked on the side of the highway further ahead on northbound I-5 who kept an eye out for the vehicle.

Agent Jose Martin Del Campo, the supervisor of the Border Patrol's smuggling interdiction group, was positioned on the side of the highway in an unmarked vehicle about two miles south of the San Clemente Border Patrol checkpoint. Martin Del Campo was wearing plain clothes with a ballistic vest with a badge marked "CPB Border Patrol"

4

in gold lettering. The vest sits up high on the chest and is visible to drivers on the road. He also had a computer terminal in the vehicle, which was visible above the dashboard.

Agent Martin Del Campo received information to be on the lookout for a 2002 Mazda Tribute. When he located the vehicle, it was traveling about 70 miles per hour with the normal speed of traffic. He followed it and noticed it had a newer license plate on an older vehicle. He followed the vehicle about two miles beyond the nonoperational checkpoint.

After confirming the license plate number with the other agents, Agent Martin Del Campo moved up alongside the vehicle to pace it and look at the driver. He rolled down his window so the driver could see him. Aguilar started to slow down. Aguilar glanced at Martin Del Campo, but then stared straight ahead. Aguilar then slowed down well below the speed of traffic, to about 50 or 55 miles per hour. When Martin Del Campo got behind Aguilar's vehicle, he noticed Aguilar was looking in his mirrors a lot, focusing more on where Martin Del Campo was than the road ahead. Aguilar also made some unnecessary lane changes. After following Aguilar for two or three miles, Martin Del Campo decided to pull him over because he believed he had reasonable suspicion of criminal activity.

When Agent Martin Del Campo approached Aguilar, Aguilar appeared to be sweating, which Martin Del Campo thought was unusual since he was in an air-conditioned vehicle. Aguilar's hands shook when he handed Martin Del Campo his identification. Aguilar said he was coming from Mexico and was going to visit a friend in Los Angeles.

5

A canine agent also responded and asked Aguilar to step out of the vehicle. Aguilar took his cane and a sandwich from the front seat. The agent thought this was unusual because people usually leave their food. When people are involved in criminal activity, "they overdo things a little bit to try to look like the common public." However, Aguilar consented to a search of the vehicle by agents and a canine. During the search, Aguilar sat on the side of the road looking into traffic rather than watching the vehicle. When he was told the canine had alerted to the vehicle, Aguilar fumbled and dropped his sandwich, but picked it up quickly and resumed looking into traffic.

Agents began a search of the vehicle on the side of the road. The door panels appeared to be loose to the touch and extremely clean where the plastic meets the metal of the door. There was tin foil inside the door panels. The floor appeared to have been raised because the floorboard looked almost flush with the transmission hump. When they felt under the vehicle and touched the carpet above the floor, there appeared to be a gap. The agents took the vehicle back to the checkpoint to search it there. Aguilar consented to the search. When an agent drove the vehicle back to the checkpoint, he noticed his head was close to the ceiling, further suggesting a compartment under the seats.

Upon further investigation, they discovered a false compartment under the floorboards with a substantial number of narcotic packages. In addition, every plastic panel along the outer edge of the vehicle had narcotics behind it wrapped in adhesive foil, commonly used to defeat an X-ray. They found approximately 185 pounds of methamphetamine packed into the vehicle, with an estimated value of over $2 million.

6

DISCUSSION

I

*Motion to Suppress*

A

Pursuant to Penal Code section 1538.5, Aguilar moved to suppress the narcotics found in the warrantless search of the vehicle he was driving contending there was no basis for the initial stop, detention or search. The court denied the motion to suppress. Based upon the totality of the circumstances, the court concluded it was reasonable to stop and initially detain Aguilar. The court found the time of the initial detention while the canine searched the vehicle was reasonable. Once the canine alerted, the level of reasonable suspicion was heightened and an initial search disclosing additional concerns regarding the vehicle gave probable cause to continue with a more detailed search. In addition, Aguilar gave consent to the search. As a result, the court denied the motion to suppress.

Aguilar contends his detention violated the Fourth Amendment of the United States Constitution because the agents had a "collective hunch" rather than reasonable suspicion to pull him over and, as a result, the court should have suppressed the 185 pounds of methamphetamine seized during the subsequent search of the vehicle, to which Aguilar consented. We disagree.

B

In reviewing a motion to suppress ruling " ' "we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, [but]

7

we exercise our independent judgment in determining the legality of a search on the facts so found. " ' " (*People v. Tully* (2012) 54 Cal.4th 952, 979.) "Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court. . . . Accordingly, '[w]e view the evidence in a light most favorable to the order denying the motion to suppress' [citation], and '[a]ny conflicts in the evidence are resolved in favor of the superior court ruling.' " (*Ibid*., citations omitted.)

" 'The Fourth Amendment protects against unreasonable searches and seizures. [Citations.] "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." [Citation.] Ordinary traffic stops are treated as investigatory detentions for which the officer must be able to articulate specific facts justifying the suspicion that a crime is being committed. [Citations.] [¶] . . . [¶] Law enforcement officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " ' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145-146 (*Letner and Tobin*).)

" 'The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability[,]" [citation] . . . tak[ing] into account "the totality of the circumstances . . . ." [Citation] . . . . Although a mere " 'hunch' " does not create reasonable suspicion, [citation] . . . , the level

8

of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause, [citation].' " (*People v. Brown* (2015) 61 Cal.4th 968, 981 (*Brown*).)

C

In this case, agents stopped Aguilar based on more than an inchoate hunch. The agents were working a known smuggling corridor where, in their experience, smugglers stop and wait at the rest area until the Border Patrol checkpoint becomes nonoperational. Agent Naranjo, a trained and experienced agent, was patrolling the rest area looking for vehicles that might be engaged in this activity. He noticed an older vehicle with newer license plates. Based on his experience, this was consistent with criminal or smuggling activity. In addition, he noticed Aguilar watching him through mirrors positioned in a way to enable him to see cars passing behind him.

Finding these observations suspicious, Agent Naranjo ran a records check on the license plate and learned the vehicle had crossed the international border nearly three hours before he encountered the vehicle in the parking lot near the checkpoint. This gap in time was also suspicious for smuggling activity. In addition, Naranjo learned there was an alert associated with Aguilar, who had been identified at the border. Based on this additional information, and knowing the checkpoint had changed from operational to nonoperational, Naranjo asked other agents to check the rest area parking lot for the vehicle. When they did not locate the vehicle, Naranjo asked Agent Martin Del Campo to watch for the vehicle coming toward his direction.

9

Agent Martin Del Campo located and followed Aguilar's vehicle for several miles. He noted the new license plate on the older vehicle. He also noted Aguilar's suspicious driving behavior such as staring ahead after noticing Martin Del Campo, slowing significantly, and then watching the agent behind him rather than the road. "In these circumstances, a reasonable officer might suspect the driver of the car was attempting to avoid contact with the police." (*Letner and Tobin*, *supra*, 50 Cal.4th at pp. 147, 148 [deceleration and maintaining a slower than expected speed in the presence of a law enforcement officer may contribute to reasonable suspicion suggesting nervousness or involvement in criminal activity]; see *United States v. Arvizu* (2002) 534 U.S. 266, 275-276 (*Arvizu*) ["a driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance . . . while quite unusual in another . . . ." An officer is entitled to assess the situation in light of his or her specialized training.].) Martin Del Campo stopped the vehicle based upon his own observations of both the vehicle and the driver along with the information about where and how the vehicle was spotted, the fact the vehicle left the rest area and proceeded north after the checkpoint became nonoperational, and the existence of an alert.[1]

---

[1]     Agent Naranjo did not testify regarding the content of the alert related to Aguilar at the motion to suppress hearing. Instead, he described in general terms how government alerts are created using computer algorithms and intelligence gathering. He stated the existence of an alert is an indication the person may be involved in some sort of criminal activity. Similarly, Agent Martin Del Campo did not testify regarding the content of the alert, but stated alerts in general indicate a law enforcement officer at some point suspected the individual of being involved in criminal activity. Martin Del Campo did not stop Aguilar based upon the content of the alert. Instead, its existence was only one piece of information he took into consideration along with his own observations and

10

Even though Aguilar suggests there could be innocent explanations for each of his activities, the United States Supreme Court has rejected this sort of "divide-and-conquer analysis" stating "[a]lthough each of the series of acts was 'perhaps innocent in itself,' . . . taken together, they 'warranted further investigation.' " (*Arvizu, supra,* 534 U.S. at p. 274.) Indeed, " '[w]here a reasonable suspicion of criminal activity exists, "the public rightfully expects a police officer to inquire into such circumstances 'in the proper exercise of the officer's duties.' " ' " (*Brown*, *supra*, 61 Cal.4th at p. 981.) "The purpose of the detention is to resolve the ambiguity by allowing the officer to briefly investigate further." (*Id.* at p. 986.)

*People v. Hernandez* (2008) 45 Cal.4th 295, 300-301 (*Hernandez*), a case relied upon by Aguilar, is inapposite. In *Hernandez,* the California Supreme Court determined a police officer did not have a particularized suspicion to stop a truck based only on the fact the truck displayed a temporary permit and no license plates. The court rejected the contention the officer was entitled to rely on his experience that temporary permits are often invalid because there was no other objective indication the defendant was violating the law. (*Id*. at pp. 299-300.) The court distinguished the case of *People v. Saunders* (2006) 38 Cal.4th 1129, 1131 (*Saunders*) in which the court determined an investigative

those of other agents to make the stop for further investigation. In ruling on the motion to suppress, the court did not consider the alert for the truth, but allowed testimony about the alert only for the limited purpose of the effect on the agents' subsequent actions. Under these circumstances, we conclude Aguilar has not shown the applicability of the hearsay rule drawn from *People v. Harvey* (1958) 156 Cal.App.2d 516 and *People v. Madden* (1970) 2 Cal.3d 1017, which requires a showing that the hearsay information relied upon by an arresting or detaining officer is sufficiently specific and fact based to be considered reliable.

stop of a truck with a missing front license plate, an expired rear license plate, and a temporary permit did not run afoul of the Fourth Amendment. The court noted the Department of Motor Vehicles procedures require a registered owner seeking to replace lost, stolen or mutilated plates to surrender remaining plates. Since the *Saunders* vehicle had both an expired plate and a temporary permit, the officer had justification to stop the vehicle to investigate the vehicle's compliance with the law. (*Hernandez*, *supra*, 45 Cal.4th at p. 300, citing *Saunders*, *supra*, 38 Cal.4th at pp. 1131, 1137.)

The facts here are more similar to *Saunders* than they are to *Hernandez*. In this case, the agents had more evidence than just a replated older vehicle. They observed numerous other objective facts, which collectively gave rise to a reasonable suspicion of criminal activity and warranted further investigation. Based on the totality of the circumstances, the agents had a particularized and objective basis for suspecting Aguilar's involvement in smuggling activity. We, therefore, conclude the trial court properly denied the suppression motion. (*Letner and Tobin*, *supra*, 50 Cal.4th at p. 149.)

II

*Motion for Mistrial*

A

Prior to trial, the court granted a defense motion in limine to exclude testimony regarding Department of Homeland Security alerts for Aguilar unless used for impeachment. The court determined the information was unduly prejudicial unless there was testimony about the basis for the information because it would suggest, "Aguilar would have some sort of character or background that would subject him to this alert."

12

The court also noted the relevance of the information went to the legality of the vehicle stop, which was not an issue for trial since the motion to suppress had been denied.

At the end of the first day of trial, during his testimony regarding his initial suspicion about the vehicle he saw in the rest area parking lot, Agent Naranjo explained he determined through a records check that the vehicle had crossed the border earlier that morning. He decided to "dig a little further into the record checks" and commented he learned Aguilar "had an alert." Defense counsel immediately objected. The court sustained the objection and instructed the jury to disregard the testimony.

Defense counsel then moved for a mistrial. The court denied the motion for mistrial stating the witness did not go into detail about the fact it was a Department of Homeland Security alert. Additionally, the court noted it sustained the objection and advised the jury to disregard the statement. Since the court had previously advised the jury they could not consider an answer to which the court sustained an objection, the court expected the jury to follow the instruction.

On appeal, Aguilar contends the comment he had "an alert" was incurably prejudicial and the court abused its discretion in denying his motion for mistrial. We again disagree.

B

"A trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]. 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the

13

trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.] Accordingly, we review a trial court's ruling on a motion for mistrial for abuse of discretion." (*People v. Avila* (2006) 38 Cal.4th 491, 573 (*Avila*); accord, *People v. Dement* (2011) 53 Cal.4th 1, 39-40.)

We conclude the trial court did not abuse its discretion in denying the motion for mistrial. When Agent Naranjo made a brief comment that Aguilar "had an alert," the court sustained an immediate objection and instructed the jury not to consider the testimony. The jury was given no information about what an alert is or how it had any significance to the case. As such, the court "did not abuse its discretion in concluding that any prejudicial effect [from the brief and ambiguous remark] could be cured by an admonition." (*People v. Collins* (2010) 49 Cal.4th 175, 199.) We presume the jury followed the court's instructions to disregard the testimony to which an objection was sustained. (*Avila*, *supra*, 38 Cal.4th at p. 574.)

DISPOSITION

The judgment is affirmed.

MCCONNELL, P. J.

WE CONCUR:

NARES, J.

AARON, J.

14