963 So.2d 370 (2007)
Antonio BRAVO, Appellant,
v.
STATE of Florida, Appellee.
No. 2D06-1760.
District Court of Appeal of Florida, Second District.
August 31, 2007.
*371 Keith P. Ligori, Tampa, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Richard E. MacDonald, Assistant Attorney General, Tampa, for Appellee.
WALLACE, Judge.
Antonio Bravo appeals from the judgment and sentence imposed on him after he pleaded no contest to trafficking in amphetamine. Mr. Bravo reserved the right to appeal the trial court's dispositive order denying his motion to suppress contraband that he discarded during a tussle with law enforcement officers. Because Mr. Bravo abandoned the contraband after an arrest based on probable cause, we affirm his judgment and sentence.

I. THE FACTS
The facts in this case are undisputed. On the afternoon of April 12, 2002, Sergeant Charles Michael Baldwin of the Polk County Sheriff's Office executed a warrant for the arrest of John Doe[1] at Mr. Doe's residence in Polk County. Sergeant Baldwin was accompanied by two agents from the Drug Enforcement Agency (the DEA), Armando Guerrero and Terry Corn. The charges against Mr. Doe in the warrant were for the sale of methamphetamine and possession of methamphetamine. Based on events that occurred during his arrest, Mr. Doe was also charged with possession of cannabis and possession of drug paraphernalia.
Shortly after his arrest, Mr. Doe agreed to cooperate with the officers in exchange for their promise to inform the State Attorney about his "substantial assistance." To that end, Mr. Doe identified Mr. Bravo as his methamphetamine supplier and agreed to arrange a purchase of the drug from Mr. Bravo. Later that afternoon and evening, Mr. Doe made several telephone calls from his residence to Mr. Bravo at Mr. Bravo's place of employment. The three officers monitored and recorded these calls. During one of the calls, Mr. Doe told Mr. Bravo that he had enough money to purchase "one," indicating one ounce of methamphetamine. Mr. Bravo responded that he would come to Mr. Doe's residence when Mr. Bravo completed his duties at work. Notably, Mr. Bravo also told Mr. Doe, "I'll bring as much as I can."
On the day Mr. Doe was arrested, the officers had never previously used him as an informant. Nevertheless, one or more of the DEA agents  including Agent Corn  had previously conducted surveillance operations against Mr. Bravo. As a result of this surveillance, the agents had a photograph of Mr. Bravo and had already identified him as the person they suspected was acting as Mr. Doe's methamphetamine supplier. The agents had also seen Mr. Doe at Mr. Bravo's place of employment. In addition to making the monitored telephone calls, Mr. Doe told the officers that he generally purchased one-half ounce of methamphetamine from Mr. Bravo. Mr. Doe also told the officers that Mr. Bravo made the deliveries at Mr. Doe's residence using a red sports utility vehicle. Finally, Mr. Doe supplied the interesting detail that Mr. Bravo wrapped *372 the drugs in black electrical tape  forming a "black ball"  and carried them in his pocket.
At 9 p.m. that evening, Mr. Bravo called Mr. Doe and said that he was in the area and would be arriving shortly. The three officers remained stationed inside Mr. Doe's house. They were wearing "raid vests" that identified them as law enforcement officers. The officers recognized Mr. Bravo when he arrived at the residence about ten minutes after the last telephone call. He was driving a red sports utility vehicle. Mr. Doe greeted Mr. Bravo on the porch and made small talk while he led Mr. Bravo into the living room.
As soon as Mr. Bravo entered the living room, the officers emerged from hiding and began what Sergeant Baldwin would later describe as "the takedown." The three officers announced: "Police[!] You're under arrest[!]" Next, Agents Guerrero and Corn attempted to grab Mr. Bravo's arms and handcuff him. The force of this encounter spun Mr. Bravo around so that he was facing Sergeant Baldwin. The sergeant watched as Mr. Bravo reached into one of his pockets, removed some items, and threw the items to the living room floor. After these objects landed on the floor, Agents Guerrero and Corn were able to handcuff Mr. Bravo.
Sergeant Baldwin immediately retrieved the items that Mr. Bravo had thrown to the floor. He found a package of cigarettes and what appeared to be a ball of black electrical tape. Inside the electrical tape were two baggies containing methamphetamine. Then the officers searched Mr. Bravo and recovered $1270 in United States currency.

II. THE TRIAL COURT'S ORDER
Sergeant Baldwin and Agent Guerrero were the only witnesses who testified at the hearing on Mr. Bravo's motion to suppress. After the hearing, the trial court entered a lengthy written order with detailed findings of fact and conclusions of law. The trial court found that the initial encounter between Mr. Bravo and the two DEA agents that had prompted him to discard the contraband was not an arrest but rather "a detention, based on reasonable suspicion." The trial court concluded that "because it was not until after [Mr. Bravo] threw the drugs on the ground that the arrest was achieved, the arrest was supported by probable cause pursuant to the plain view doctrine." On these grounds, the trial court ruled that "the detention and subsequent arrest were properly supported by reasonable suspicion and probable cause, respectively."[2]

III. THE STANDARD OF REVIEW
We employ a mixed standard of review in considering the trial court's ruling on Mr. Bravo's motion to suppress. The trial court's determination of historical facts enjoys a presumption of correctness and is subject to reversal only if not supported by competent, substantial evidence in the record. However, the trial court's determinations on mixed questions of law and fact and its legal conclusions are subject to de novo review. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); Connor v. State, 803 So.2d 598, 608 (Fla.2001); E.B. v. State, 866 So.2d 200, 202 (Fla. 2d DCA 2004).

IV. MR. BRAVO'S ARGUMENTS
On appeal, Mr. Bravo appears to concede that the officers had a reasonable *373 suspicion of criminal activity that would have justified his temporary detention. See Popple v. State, 626 So.2d 185, 186 (Fla.1993) (identifying three levels of police-citizen encounters, including (1) a consensual encounter, (2) a temporary detention or investigatory stop, and (3) an arrest). But Mr. Bravo contends that the trial court erred in finding that the officers had conducted only a temporary detention before he discarded the contraband. Mr. Bravo argues that the officers simply arrested him  without probable cause. If Mr. Bravo was illegally arrested, it follows that the trial court erred in denying his motion to suppress. A suspect who abandons or discards property as a result of an illegal stop or arrest does so involuntarily, and the abandoned or discarded property must be suppressed. See State v. Anderson, 591 So.2d 611, 613 (Fla.1992); Baggett v. State, 849 So.2d 1154, 1157 (Fla. 2d DCA 2003).

V. FRAMING THE ISSUES
Based on Mr. Bravo's arguments, the initial question we address is whether the trial court correctly concluded that the law enforcement officers temporarily detained Mr. Bravo to further their investigation and arrested him only after he discarded the contraband. If the answer to this question is in the affirmative, then we must affirm Mr. Bravo's judgment and sentence.[3] But if the answer to this question is in the negative, then we must address the State's alternative argument that the officers had probable cause to arrest Mr. Bravo as soon as he walked into Mr. Doe's living room.[4]See § 901.15(3), Fla. Stat. (2001); Popple, 626 So.2d at 186 (stating that an arrest "must be supported by probable cause that a crime has been or is being committed").

VI. DISCUSSION
A. Temporary Detention or Arrest?
The trial court based its legal reasoning largely on this court's decision in State v. Hendrex, 865 So.2d 531 (Fla. 2d DCA 2003). In Hendrex, the defendant had been arrested after police officers, with guns drawn, ordered him to get out of his car and lie on the ground. Id. at 533. The defendant "removed a small plastic bag containing a white powdery substance from his . . . pocket and placed it on the ground . . . as he lay down." Id. The Hendrex court determined that the initial stop was "an investigatory stop and not an arrest" and that the defendant's voluntary production of the contraband provided the probable cause to convert the stop into an arrest. Id. at 534. Here, the trial court determined that the officers' initial encounter with Mr. Bravo was similar to the stop under review in Hendrex and that Mr. Bravo's jettison of the black ball provided the necessary probable cause to justify his arrest.
We disagree. Sergeant Baldwin testified that when Mr. Bravo entered Mr. Doe's residence, "[t]here was no real time lapse" and that the events happened "very quick[ly]." The sergeant explained that Mr. Doe led Mr. Bravo into the living room where Agent Guerrero and Agent Corn "attempt[ed] to detain him." Sergeant Baldwin said that Mr. Bravo "turned *374 facing me upon being taken down" and pulled the black ball containing the contraband from his pocket before the agents were able to secure his hands. Agent Guerrero testified that he did not see Mr. Bravo throw anything on the floor while the agents were restraining him. He described his encounter with Mr. Bravo, stating, "I approached him and attempted to grab his arm and place handcuffs on him." The agent said that his mask interfered with his ability to see everything that happened. He continued, "[W]hen I made contact with him, there was a little slight scuffle trying to get the handcuffs on him, and my mask was, you know, was thrown around my face a bit until we were able to handcuff him."
At the hearing on the motion to suppress, Sergeant Baldwin described the incident in Mr. Doe's living room as a "takedown."[5] The sergeant testified that the officers believed that they had probable cause to arrest Mr. Bravo before he entered the residence. Before Mr. Bravo had even walked into the house, the officers' plan was to arrest him and search him. Neither Sergeant Baldwin nor Agent Corn testified that they intended to advance their investigation by speaking with Mr. Bravo before proceeding further. What is more, neither of the officers ever suggested during the hearing that they believed that they needed to search Mr. Bravo because they were concerned for their safety.[6] Furthermore, the officers' testimony did not indicate that their plans changed once Sergeant Baldwin saw Mr. Bravo discard the black ball. Rather, Sergeant Baldwin testified that the officers intended to arrest and search Mr. Bravo "based on the totality of the circumstances of . . . the phone calls, . . . the time frame of his arrival, the description of his vehicle upon arrival, the identification of him upon arrival, and the fact that he entered into the residence." Without question, the scope of the search that the officers had in mind exceeded the limited pat-down search for weapons that would have been permissible during a temporary detention of Mr. Bravo. See Frazier v. State, 789 So.2d 486, 488 (Fla. 2d DCA 2001) (recognizing that a pat-down search may be executed if, "during a lawful investigatory stop, [the] officer has probable cause to believe that a subject is armed" and noting that once the officer determines that there are no weapons present, the search should end).
To resolve the question of whether the officers temporarily detained Mr. Bravo or arrested him, we consider the elements of an arrest. An arrest includes the following four elements:
(1) A purpose or intention to effect an arrest under a real or pretended authority; (2)[a]n actual or constructive seizure or detention of the person to be arrested by a person having present power to control the person arrested; (3)[a] communication by the arresting officer to the person whose arrest is sought, of an *375 intention or purpose then and there to effect an arrest; and (4)[a]n understanding by the person whose arrest is sought that it is the intention of the arresting officer then and there to arrest and detain him.
Melton v. State, 75 So.2d 291, 294 (Fla. 1954) (citations omitted). Reviewing the facts of this case in light of these four elements, we note the following. First, the officers' admitted intention was to arrest Mr. Bravo. Second, Mr. Bravo was seized when the two DEA agents grabbed his arms and began to place handcuffs on him. Third, as soon as Mr. Bravo had entered Mr. Doe's living room, the officers announced their status as law enforcement officials and informed Mr. Bravo that he was under arrest. Fourth, Mr. Bravo clearly understood that the officers' intention was to arrest him. Thus all of the elements of an arrest are present here. See State v. Gonzalez, 870 So.2d 200, 201-02 (Fla. 3d DCA 2004) (holding that a suspect had been placed under arrest when he was rushed by law enforcement officers, ordered out of his car at gunpoint, thrown to the ground, and handcuffed while lying face down on a parking lot).
For these reasons, we conclude that the officers arrested Mr. Bravo as soon as he entered Mr. Doe's living room. The trial court incorrectly determined that the officers' initial stop of Mr. Bravo was an investigatory stop that became an arrest only after Mr. Bravo discarded the black ball.
B. Reasonable Suspicion or Probable Cause?
Having determined that the officers' arrest of Mr. Bravo was immediate rather than deferred until after he had discarded the contraband, we must now reach the question of whether they had probable cause to make the arrest or if the officers acted based on a mere suspicion. In addressing this question, we "consider the `totality of [the] circumstances' that led to the discovery of [the] evidence." Hendrex, 865 So.2d at 533 (first alteration in original) (quoting State v. Butler, 655 So.2d 1123, 1128 (Fla.1995)). Sergeant Baldwin testified that either Agent Corn or another DEA agent had already conducted surveillance operations on Mr. Bravo. Further, the sergeant testified, "I heard on the other end of the phone Mr. Bravo telling Mr. [Doe] that he would be there when he got off work, and he would bring as much as he could when he got off work." (Emphasis added.) Sergeant Baldwin also testified that the final telephone conversation between Mr. Doe and Mr. Bravo was a call from Mr. Bravo to Mr. Doe that occurred approximately ten minutes before Mr. Bravo arrived at Mr. Doe's residence. During that call, Mr. Bravo said that he would be arriving at Mr. Doe's residence "very soon." Mr. Bravo did not present any evidence to contradict the sergeant's testimony on these points. Instead, he merely noted that the officers could not be certain of the identity of the person with whom Mr. Doe was speaking on the telephone.
Mr. Bravo correctly observes that most of the officers' information was obtained from Mr. Doe, who did not have a record as a reliable, confidential informant. However, we agree with the trial court's assessment that Mr. Doe was a reliable, albeit unproven, informant for many of the same reasons that we found the informant in Hendrex to be reliable: Mr. Doe demonstrated his ability to influence and predict Mr. Bravo's behavior, and Mr. Doe's statements were against his own penal interest and reflected his desire to "curry favor with the authorities." See Hendrex, 865 So.2d at 535. Mr. Doe was unlikely to get his "substantial assistance" letter from the officers if he misled them. Furthermore, *376 the detailed information that Mr. Doe gave the officers indicated that he had first-hand knowledge of Mr. Bravo's drug-selling activities  a fact that the officers already suspected from their observations of Mr. Doe at Mr. Bravo's place of employment. See State v. Butler, 655 So.2d 1123, 1128 (Fla.1995) (citing Illinois v. Gates, 462 U.S. 213, 238-39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)) (noting that an informant's basis of knowledge continues to be a "`relevant consideration [ ]' in an overall totality of circumstances analysis").
Although the officers did not observe Mr. Bravo committing any crime before they arrested him, they did verify the details that Mr. Doe had provided about the color and model of Mr. Bravo's vehicle and the typical transaction wherein he would deliver the methamphetamine at Mr. Doe's residence. The officers had also identified Mr. Bravo from their prior surveillance operations. Most important, the officers had heard the person on the telephone that Mr. Doe identified as Mr. Bravo stating that he would bring as much as he could. The officers reasonably believed that this statement was a promise to deliver a quantity of methamphetamine. Under these circumstances, we conclude that the officers had probable cause to believe that Mr. Bravo was engaged in committing a felony when he entered Mr. Doe's residence. Here, because the officers verified the details "except for the final one of the commission of the crime," the arrest was valid. State v. Flowers, 566 So.2d 50, 51 (Fla. 2d DCA 1990); see also Butler, 655 So.2d at 1129-31 (approving Flowers, 566 So.2d at 51, and State v. Brown, 556 So.2d 790 (Fla. 2d DCA 1990)).

VII. CONCLUSION
For these reasons, the trial court properly denied Mr. Bravo's motion to suppress. Accordingly, we affirm Mr. Bravo's judgment and sentence.
Affirmed.
FULMER and DAVIS, JJ., concur.
NOTES
[1] The name "John Doe" is a pseudonym.
[2] We commend the trial court for its thorough and thoughtful order disposing of Mr. Bravo's motion to suppress. The trial court's order has facilitated this court's review of this case.
[3] Mr. Bravo does not contend that the officers lacked the reasonable suspicion necessary to conduct a temporary detention.
[4] We may consider the State's alternative argument under the rule of appellate efficiency commonly referred to as the "tipsy coachman" rule. See Robertson v. State, 829 So.2d 901, 906-07 (Fla.2002); Dade County Sch. Bd. v. Radio Station WQBA, 731 So.2d 638, 644-45 (Fla.1999).
[5] The officer's characterization of the incident after the fact is not controlling. However, this court understands that the term "takedown"  when used in this context  denotes an arrest. See Johnson v. State, 581 So.2d 220, 221 (Fla. 2d DCA 1991). In sports, the term "takedown" refers to "[a] move or maneuver in wrestling or the martial arts in which a standing opponent is forced to the floor." The American Heritage Dictionary of the English Language 1764 (4th ed.2000). Law enforcement officers often employ such a move or maneuver when making an arrest. It is for this reason that we suppose that the word "takedown" has become a slang expression for the arrest of a suspect by a police officer. See takedown-Wiktionary, http://en. wiktionary.org/wiki/takedown (last visited Aug. 10, 2007).
[6] In fact, Mr. Bravo was unarmed.