33 A.3d 1042

WALLACE H. CAMPBELL & COMPANY, INC.

v.

MARYLAND COMMISSION ON HUMAN RELATIONS.

Nos. 291, 1310, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Dec. 22, 2011.

Andrew Gendron & Michael J. DeVinne (Venable LLP, on the brief), Baltimore, MD, for Appellant.

Terrence J. Artis (Glendora C. Hughes, Patricia A. Wood, MD Commission of Human Relations, on the brief), Baltimore, MD, for Appellee.

Panel: MEREDITH, HOTTEN, LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

HOTTEN, J.

Austin Scarlett, who used a wheelchair and resided in one of Wallace H. Campbell & Company, Inc.'s ("the Campbell Company") buildings, became frustrated with the Campbell Company's lack of responsiveness to his concerns and sought to mediate those issues with the Campbell Company. The mediation was unsuccessful. Based on events arising from the mediation, Scarlett filed a complaint with the Maryland Commission on Human Relations ("the Commission"), alleging that the Campbell Company had discriminated against Scarlett by holding the mediation at a wheelchair inaccessible location.

After an eventful history before an Administrative Law Judge and the Commission's appeal board, this matter was heard by the Circuit Court for Baltimore City on the Campbell Company's petition for judicial review. On April 6, 2010, the circuit court affirmed the Commission's final decision, which ordered the Campbell Company to pay $7,500 in damages and $5,000 as a civil penalty. On July 27, 2010, the circuit court granted the Commission's petition for judicial enforcement and entered judgment against the Campbell

Company for $7,500 in damages and $5,000 as a civil penalty. The Campbell Company timely appealed both circuit court decisions, and we ordered that the appeals be consolidated. The Campbell Company presents the following questions for our review, which we quote:

    1.  Does 49B § 22(a)(9)[1] require that a reasonable accommodation be made where none has been requested?

    2.  Was the Campbell Company's participation—as one of the two disputants—a "practice" or "service" within the ambit of 49B § 22(a)(9)?

For the reasons discussed below, we conclude that Md.Code (1957, 2003 Repl.Vol.), Article 49B § 22(a)(9) requires a request before there can be a refusal to provide a reasonable accommodation, and, therefore, we do not reach the Campbell Company's second question.

## FACTUAL AND LEGAL PROCEEDINGS

Austin Scarlett lived in Greenhill Housing, a federally subsidized apartment complex in Baltimore City. He suffered from several maladies, including hypertension, depression, morbid obesity, and diabetes, the last of which necessitated the amputation of his left leg above the knee. As a result, Scarlett used a motorized wheelchair for mobility, and the facilities at Greenhill Housing were fully accessible to him.[2]

The Campbell Company managed Greenhill Housing, in addition to approximately 110 other apartment and condominium complexes. R. Bruce Campbell was the president, chair, and chief executive officer of the Campbell Company. Frank

---

**1.** Md.Code (1957, 2003 Repl.Vol.), Article 49B § 22(a)(9) has been recodified in substantially the same form in Md.Code (2009), § 20–706(b)(4) of the State Government Article ("S.G."), and the Legislature intended no substantive change. Section 2 of Chapter 120 of the 2009 Acts.

**2.** Regrettably, Scarlett passed away in November 2008 while the appeal of the Administrative Law Judge Murray's Recommended Decision on Remand was pending before the Commission's Appeal Board.

Stromyer was a vice president of the Campbell Company and local site manager of Greenhill Housing.

Scarlett had several conflicts with his neighbors in Greenhill Housing, including an 80–year–old woman who lived directly above his apartment. Scarlett complained that the woman's doors squeaked loudly, yet nothing was done to address the issue. Eventually, the issues with the woman upstairs escalated, and she refused to address the squeaky doors or allow Greenhill Housing into her apartment to repair them. She even resorted to slamming the doors in her apartment at night, knowing that it would disturb Scarlett. Scarlett believed he was being discriminated against because he was in a wheelchair.

Scarlett met with Stromyer on at least three occasions at Greenhill Housing to discuss Scarlett's complaints. Stromyer met with the woman upstairs and sent her several letters, but the issues remained unresolved. Scarlett then contacted the Baltimore City Community Relations Commission ("BCCRC") to mediate and resolve the dispute between Scarlett and Greenhill Housing. BCCRC referred Scarlett's case to Wanda M. Belle, who was a graduate student in negotiation and conflict management at the University of Baltimore and was interning at BCCRC as a volunteer mediator. Scarlett advised Belle that he preferred to conduct the mediation at Greenhill Housing because it was convenient for him. Belle sent a letter to Campbell, inviting him to mediate Scarlett's complaints through BCCRC. Belle sent the letter to the Campbell Company's office on Meridene Road, which was fully handicapped accessible. The Campbell Company advised that Stromyer, but not Campbell, would mediate with Scarlett. Scarlett only wanted to mediate with Campbell.

Campbell later agreed to attend the mediation if it were held at the Campbell Company's new office at 6212 York Road ("the Campbell Building") because the paperwork concerning Scarlett's complaints was there and it was a more neutral location than Greenhill Housing. Belle informed Scarlett that Campbell agreed to mediate Scarlett's noise and discrimina-

tion complaints, and a meeting was scheduled for 5:30 p.m. on January 23, 2003 at the Campbell Building. At no time during Belle's communications with Campbell did she ascertain whether Campbell was aware that Scarlett used a wheelchair or that he wanted the mediation to take place at a handicapped accessible location.

Several months before the mediation, Scarlett was among twenty-five to thirty Greenhill Housing tenants who attended a meeting held by Campbell at Greenhill Housing. Scarlett asked Campbell a question from several feet away, and Campbell responded to what he characterized to be a "good question." In the month before the scheduled mediation, Scarlett sent Campbell between thirty and fifty e-mails, most of which were copies of e-mails Scarlett previously sent to Stromyer. Campbell received the e-mails and relayed them to Stromyer. Scarlett had never been to the Campbell Building before the mediation, but based on his communications with Belle and Stromyer, he assumed that the building was wheelchair accessible.

The Campbell Company moved into the Campbell Building about a month and a half before the scheduled mediation. The building had one wheelchair accessible restroom, but not a wheelchair accessible entrance. A few days before the mediation, Stromyer advised Campbell that Scarlett used a wheelchair, and Campbell decided that it was better to proceed with the mediation at the Campbell Building rather than postpone it. Campbell thought that he, his son, and Stromyer would be able to help Scarlett into and out of the building.

Scarlett arrived at the Campbell Building around 5:30 p.m. on January 23, 2003 by Maryland Transit Administration Mobility van. The driver advised that the building was not wheelchair accessible and offered to take Scarlett home after making a stop in nearby Towson. Scarlett had the driver drop him off and approached the steps to the building in his wheelchair. Campbell, his son, and Stromyer hurried out of the building to assist Scarlett enter the building through the rear entrance, which had a three-inch step and a six-inch step.

Scarlett stood up, not asking for assistance, but when Campbell, his son, and Stromyer offered help, Scarlett did not object and hopped up the two steps to the entrance. Scarlett entered the building and stood against the wall with his arms outstretched to keep his balance. Campbell stood nearby. Campbell's son and Stromyer carried the wheelchair up the steps, and Scarlett got back into it. At the time, Scarlett weighed 335 pounds, and the motorized wheelchair weighed at least 100 pounds.

Scarlett, Stromyer, Campbell, Belle, and the co-mediator went to the meeting room and participated in the mediation. The meeting lasted about two hours, but no agreement was reached. After the meeting, Scarlett asked to use the restroom. Stromyer led Scarlett to the nearest restroom, but it was not wheelchair accessible. Scarlett's wheelchair could not fit through the door, so he got out of his wheelchair and hopped into the restroom. Scarlett used the restroom while Stromyer held the door open. Stromyer was unaware of the existence of a wheelchair accessible restroom in the Campbell Building, and Scarlett did not ask whether there was a wheelchair accessible restroom in the building.

After using the restroom, Scarlett maneuvered his wheelchair to the exit, stood up, and was assisted by Campbell and Stromyer so they could bring the wheelchair down the steps. Scarlett hopped down the steps and held on to a car in the parking lot until Stromyer and Campbell brought the wheelchair to him. Scarlett did not complain about the means of entering and exiting the building, nor did he request special accommodations.

Scarlett continued to express his concerns to the Campbell Company regarding noise and harassment at Greenhill Housing. Scarlett communicated with representatives from the United States Department of Housing and Urban Development ("HUD") and the Commission regarding his complaints with Greenhill Housing and the Campbell Company. On April 11, 2003, Scarlett filed a complaint with the Commission, alleging that the Campbell Company, Campbell, and Stromyer

had discriminated against him and required him to mediate at a wheelchair inaccessible location.

Gregory Logan investigated the matter for the Commission. He visited the Campbell Building on September 30, 2003, at which time the entire building, including the entrances and the restrooms, was now wheelchair accessible. The Campbell Company apparently modified the Campbell Building following the mediation. Campbell advised Logan that it was Belle's idea to hold the mediation at the Campbell Building. Logan prepared a Written Finding of Probable Cause, concluding that the Campbell Company had discriminated against Scarlett on the basis of his disability, in violation of Article 49B. The Written Finding was issued on November 19, 2003 and sent to the parties. Conciliation between the parties failed, and the Commission certified the matter for a public hearing.

On August 1, 2005, the Commission filed a Statement of Charges with the Maryland Office of Administrative Hearings ("OAH"), naming the Campbell Company, Campbell, and Stromyer as respondents.[3] The Commission alleged that the respondents engaged in discriminatory housing practices in violation of Article 49B § 22(a) by failing to accommodate Scarlett's disability and by discriminating against him because of his disability. The Commission sought compensatory damages for Scarlett in an unspecified amount. The Commission also requested that the respondents be ordered to pay a civil penalty of at least $10,000, in addition to costs and attorney's fees, and be enjoined from any future discrimination against Scarlett based on his disability.

Administrative Law Judge James T. Murray ("ALJ Murray") dismissed Scarlett's claim for damages in a prehearing ruling concerning the respondents' motion for partial summary judgment. On March 1, 2006, ALJ Murray held a public hearing on the remaining claims. On December 14, 2006, ALJ Murray issued a "Recommended Decision," in which he pro-

---

3. Stromyer and Campbell, individually, were later dismissed as parties.

posed that the charges be dismissed.[4] The Commission appealed ALJ Murray's decisions to the Commission's appeal board.

On May 8, 2007, the appeal board heard oral argument at a hearing where the Commission and the respondents were represented by counsel. In its August 23, 2007 order, the appeal board reversed both of ALJ Murray's decisions and remanded to OAH for further proceedings. The appeal board found that the respondents violated Article 49B § 22(a)(9) by failing to make reasonable accommodations to afford a disabled person equal opportunity to use and enjoy a dwelling.

On October 12, 2007, ALJ Murray held a second hearing and heard testimony concerning Scarlett's visit to the Campbell Building on January 23, 2003. On February 11, 2008, ALJ Murray issued a "Recommended Decision on Remand," in which he made findings of fact and concluded that the Campbell Company discriminated against Scarlett at the Campbell Building on January 23, 2003. ALJ Murray recommended that the Commission order the Campbell Company to pay $3,500 to Scarlett for his embarrassment and humiliation as a result of the discrimination. ALJ Murray found that the violation warranted a civil penalty, but did not order a penalty because he applied an erroneous regulation rather than the governing statute.

On March 10, 2008, the Commission noted an appeal of ALJ Murray's most recent recommendation. The appeal board heard oral argument and issued a "Decision and Order" dated August 27, 2009. In its order, the appeal board increased the damages amount from $3,500 to $7,500 because the original amount was "insufficient to compensate Mr. Scarlett for the

---

4. In the absence of a timely appeal, the recommended decision of an ALJ becomes the final decision and order of the Maryland Commission on Human Relations, from which no further administrative appeal may be taken. Md.Code (1957, 2003 Repl.Vol.), Article 49B § 32(g)(2) (recodified without substantive change at S.G. § 20–1029(a)(2)); COMAR 14.03.01.11H(5). COMAR 14.03.01.12A(2) imposes a thirty day limit to file an administrative appeal of the ALJ's decision to the Commission's appeal board.

significant humiliation and embarrassment he experienced as a result of [the Campbell Company's] discriminatory conduct." The appeal board also held that the Campbell Company's "actions placed Mr. Scarlett's well-being at risk," so it ordered the Campbell Company to pay a civil penalty of $5,000 to "further a primary goal of civil penalties: to deter others from engaging in discriminatory practices." [5]

On September 28, 2009, the Campbell Company filed a petition for judicial review in the Circuit Court for Baltimore City, appealing the finding of liability and damages award in the Commission's August 27, 2009 order.[6] On April 6, 2010, the circuit court held a hearing, after which it dismissed the Campbell Company's petition and affirmed the Commission's order. On February 24, 2010, while the Campbell Company's petition was still pending, the Commission filed a petition for enforcement of the judgment in the Circuit Court for Baltimore City, and on July 27, 2010, the circuit court held a hearing on the Commission's petition. The court granted the Commission's petition and entered judgment against the Campbell Company.

The Campbell Company timely appealed both circuit court decisions, and this Court consolidated the two appeals for review. We will provide additional facts as needed for our discussion.

## STANDARD OF REVIEW

"When reviewing the decision of an administrative agency, . . . we review the agency's decision directly, not the decision of the circuit court." *Comptroller of the Treasury v.*

---

5. The August 27, 2009 "Decision and Order" was the first final order of the Commission. *See* COMAR 14.03.01.12F(4).

6. The Campbell Company has not waived any argument against a finding of liability. Because the Commission noted an administrative appeal within thirty days of ALJ Murray's "Recommended Decision on Remand," ALJ Murray's recommendation had not yet become a final order of the Commission. *See* COMAR 14.03.01.12A(2); *see also* CO-MAR 14.03.01.11H(5).

*Sci. Applications Int'l Corp.,* 405 Md. 185, 192, 950 A.2d 766 (2008). Therefore, our evaluation "is not whether the circuit court erred, but rather whether the administrative agency erred." *Classics Chi., Inc. v. Comptroller of the Treasury,* 189 Md.App. 695, 705, 985 A.2d 593 (2010) (internal quotations omitted).

Our "role in reviewing an administrative agency adjudicatory decision is narrow" and " 'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.' " *Md. Aviation Admin. v. Noland,* 386 Md. 556, 571, 873 A.2d 1145 (2005) (quoting *United Parcel v. People's Counsel,* 336 Md. 569, 576–77, 650 A.2d 226 (1994)); *see also* S.G. § 10–222(h). A court "reviewing administrative decisions . . . 'shall apply the substantial evidence test to the final decisions of an administrative agency, but it must not itself make independent findings of fact or substitute its judgment for that of the agency.' " *Md.–Nat'l Capital Park & Planning Comm'n v. Anderson,* 395 Md. 172, 180–81, 909 A.2d 694 (2006) (quoting *Balt. Lutheran High Sch. Ass'n v. Emp't Sec. Admin.,* 302 Md. 649, 662, 490 A.2d 701 (1985)).

"We must also review the agency's decision in the light most favorable to the agency since decisions of administrative agencies are *prima facie* correct[ ] . . . and carry with them the presumption of validity." *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 513, 390 A.2d 1119 (1978) (internal citations and quotations omitted). Moreover, "not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences." *Id.* (citing *N.L.R.B. v. Nev. Consol. Copper Corp.,* 316 U.S. 105, 106–07, 62 S.Ct. 960, 86 L.Ed. 1305 (1942); *Bd. of Cnty. Comm'rs v. Levitt & Sons, Inc.,* 235 Md. 151, 159–60, 200 A.2d 670 (1964); *Snowden v. Mayor & City Council of Balt.,* 224 Md. 443, 448, 168 A.2d 390 (1961)). We review questions of fact and mixed questions of law and fact with deference to the agency's

decision and presume the decision to be valid. *Charles Cnty. Dep't of Soc. Servs. v. Vann,* 382 Md. 286, 296, 855 A.2d 313 (2004); *Bulluck,* 283 Md. at 512–13, 390 A.2d 1119 (Mixed questions of law and fact are where "the agency has correctly stated the law and its fact-finding is supported by the record, but the question is whether it has applied the law to the facts correctly.").

We review an agency's decisions as to matters of law *de novo* for correctness. *Classics Chi.,* 189 Md.App. at 706, 985 A.2d 593 (citing *Schwartz v. Md. Dep't of Natural Res.,* 385 Md. 534, 554, 870 A.2d 168 (2005)). "Determining whether an agency's 'conclusions of law' are correct is always, on judicial review, the court's prerogative, although we ordinarily respect the agency's expertise and give weight to its interpretation of a statute that it administers." *Christopher v. Montgomery Cnty. Dep't of Health and Human Servs.,* 381 Md. 188, 198, 849 A.2d 46 (2004) (citations omitted); *see also Md. Aviation Admin.,* 386 Md. at 573, 873 A.2d 1145 (quoting *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376 (1999)) (" 'Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.' ").

Nevertheless, "[i]nterpretation of a statute is a question of law," so we review the agency's decision *de novo. Md.–Nat'l Capital Park & Planning Comm'n,* 395 Md. at 181, 909 A.2d 694 (citing *Salamon v. Progressive Classic Ins. Co.,* 379 Md. 301, 307, 841 A.2d 858 (2004)). Accordingly, even though the circuit court did not review the Commission's decision *de novo* as to potential errors of law, we will do so.

## DISCUSSION

The record reflects that Scarlett never asked the Campbell Company for any special accommodation. Neither Scarlett nor Belle requested a reasonable accommodation for Scarlett's

wheelchair prior to the meeting at the Campbell Building. Scarlett never requested a special accommodation when he arrived at the Campbell Building and saw the lack of a handicapped accessible entrance. He did not ask whether there was a wheelchair accessible restroom, even after Stromyer, who was unaware of the existence of a handicapped accessible restroom in the Campbell Building, showed Scarlett to an inaccessible one. Finally, Scarlett did not ask for an accommodation when he exited the Campbell Building.

To establish that the Campbell Company was aware of Scarlett's use of a wheelchair, the Commission points to the question-and-answer forum at Greenhill Housing, during which Campbell interacted with Scarlett, and Stromyer advising Campbell a few days prior to the meeting that Scarlett used a wheelchair. Although Campbell may have been aware that Scarlett used a wheelchair, it appears that neither Scarlett nor Belle asked Campbell, Stromyer, or the Campbell Company for any special accommodation for the January 23,2003 meeting. Thus, the issue posed by the Campbell Company, which is an issue of first impression for Maryland courts, is whether there must be a prior request for an accommodation before there can be a refusal in violation of Article 49B § 22(a)(9). According to the Campbell Company, because Scarlett never requested an accommodation, it could not refuse to provide the same in violation of Article 49B § 22(a)(9).

To determine whether the Campbell Company violated Article 49B § 22(a)(9), we must first determine what it prohibits. Article 49B § 22(a) states:

(a) *Unlawful practice concerning sale or rental of dwelling.*—Except as provided in § 21 of this subtitle, it is unlawful:

\* \* \*

(9) To refuse to make reasonable accommodations in rules, policies, practices, or services when the accommodations may be necessary to afford an individual with a

disability equal opportunity to use and enjoy a dwelling....

Our analysis centers on the statutory interpretation of Article 49B § 22(a)(9), specifically the word "refuse." Our goal when undertaking to interpret a statute is "to ascertain and effectuate the intention of the legislature." *Johnson v. Mayor of Balt. City*, 387 Md. 1, 11, 874 A.2d 439 (2005); *O'Connor v. Balt. Cnty.*, 382 Md. 102, 113, 854 A.2d 1191 (2004). The Court of Appeals has explained that " '[t]o determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning.' " *Md.–Nat'l Capital Park & Planning Comm'n*, 395 Md. at 182, 909 A.2d 694 (quoting *State Dept. of Assessments and Taxation v. Md.–Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 13, 702 A.2d 690 (1997); *Montgomery Cnty. v. Buckman*, 333 Md. 516, 523, 636 A.2d 448 (1994)). Generally, that is where "the search for legislative intent begins, and ordinarily ends." *FOP, Montgomery Cnty. Lodge No. 35 v. Mehrling*, 343 Md. 155, 174, 680 A.2d 1052 (1996). This is because "[w]hen the statutory language is clear, we need not look beyond the statutory language to determine the Legislature's intent." *Marriott Emp. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 445, 697 A.2d 455 (1997). A court must not "add or delete language so as to 'reflect an intent not evidenced in that language' or construe the statute with 'forced or subtle interpretations' that limit or extend its application." *Motor Vehicle Admin. v. Jaigobin*, 413 Md. 191, 197, 991 A.2d 1251 (2010) (quoting *Condon v. State*, 332 Md. 481, 491, 632 A.2d 753 (1993)).

If we determine that the statutory language is ambiguous, then we "consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of enactment." *Mehrling*, 343 Md. at 173–74, 680 A.2d 1052 (citing *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75, 517 A.2d 730 (1986)). In our construction, "we seek to avoid constructions that are

illogical, unreasonable, or inconsistent with common sense."
*Frost v. State*, 336 Md. 125, 137, 647 A.2d 106 (1994).

" '[T]he meaning of the plainest language is controlled by the context in which it appears.' " *State v. Pagano*, 341 Md. 129, 133, 669 A.2d 1339 (1996) (quoting *Kaczorowski v. Mayor and City Council of Balt.*, 309 Md. 505, 514, 525 A.2d 628 (1987)). "Because it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered." *Gordon Family P'ship v. Gar on Jer*, 348 Md. 129, 138, 702 A.2d 753 (1997) (citations omitted). Therefore, "not only are we required to interpret the statute as a whole, but, if appropriate, in the context of the entire statutory scheme of which it is a part." *Id.*

Nevertheless, the Court of Appeals has cautioned that an inquiry into the statutory history is " 'in the interest of completeness . . . to look at the purpose of the statute and compare the result with that which results when the purpose of the statute is taken into account.' " *Jaigobin*, 413 Md. at 198, 991 A.2d 1251 (quoting *Harris v. State*, 331 Md. 137, 146, 626 A.2d 946 (1993)). The statutory history inquiry " 'is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute.' " *Id.* (quoting *Mayor and City Council of Balt. v. Chase*, 360 Md. 121, 131, 756 A.2d 987 (2000)). "[A] court may not as a general rule surmise a legislative intention contrary to the plain language of a statute or insert exceptions not made by the legislature." *Coleman v. State*, 281 Md. 538, 546, 380 A.2d 49 (1977).

Black's Law Dictionary defines a "refusal" as "[t]he denial or rejection of something offered or demanded." Black's Law Dictionary 1394 (9th ed. 2009). Merriam–Webster's Collegiate Dictionary defines "refuse" as "to express oneself as unwilling to accept," "to show or express unwillingness to do or comply with," to "deny," or "to withhold acceptance, compliance, or permission." Merriam–Webster's Collegiate Dictionary 1047 (11th ed. 2005). The American Heritage Dictionary of the English Language defines "refuse" as "to decline to do, accept,

allow, or give something" and states that "[r]efuse is used of a positive, unyielding, sometimes brusque decision not to act, accept, or do something." The American Heritage Dictionary of the English Language 1094–95 (1981). The Campbell Company also directs our attention to Wiktionary,[7] which defines "to refuse" as "[t]o decline a request or demand."

While it appears that the plain meaning of "refuse" requires an underlying request, we will delve further into the statutory history and legislative intent behind Article 49B § 22(a)(9). The legislature enacted Article 49B § 22(a)(9) with the "purpose of altering the laws prohibiting discriminatory housing practices to include the provisions of the federal Fair Housing Amendments Act of 1988" and "to prohibit[ ] discriminatory housing practices in a manner substantially equivalent or similar to the federal Fair Housing Amendments Act of 1988." Chapter 571 of the 1991 Acts. " '[W]here the purpose and language of a federal statute are substantially the same as that of a later state statute, interpretations of the federal statute are ordinarily persuasive.' " *Montgomery v. E. Corr. Inst.*, 377 Md. 615, 629, 835 A.2d 169 (2003) (quoting *Fioretti v. Bd. of Dental Exam'rs*, 351 Md. 66, 76, 716 A.2d 258 (1998)). Moreover, when "the provisions are so similar and ... the common intent behind them is so clear, we may and should be guided by the case law interpretation of the Federal statute when we examine the State analog...." *Gardner v. State*, 77 Md.App. 237, 247, 549 A.2d 1171 (1988). Because the General Assembly enacted Article 49B § 22(a)(9) to be substantially similar to the Federal Fair Housing

---

7. Wiktionary, a sister project of Wikipedia, is an open-content dictionary that individuals with access can collaboratively edit to reflect a popular understanding of words. Some courts have turned to Wiktionary to determine a popular understanding of the English language rather than a traditional dictionary definition. *See, e.g., PowerDsine, Inc. v. AMI Semiconductor, Inc.*, 591 F.Supp.2d 673, 678 (S.D.N.Y. 2008); *Bravo v. State*, 963 So.2d 370, 374 n. 5 (Fla.Dist.Ct.App.2007); *In re Carleisha P.*, 144 Cal.App.4th 912, 50 Cal.Rptr.3d 777, 783 n. 5 (2006).

Amendments Act ("FHAA"), we shall examine federal cases interpreting the FHAA.[8]

Article 49B § 22(a)(9) is almost identical to the counterpart provision of the FHAA, 42 U.S.C. § 3604(f)(3)(B),[9] and federal courts have consistently interpreted 42 U.S.C. § 3604(f)(3)(B) to require a prior request. The First Circuit summarized:

> To establish a prima facie case of failure to accommodate under the FHAA, a claimant must show that he is handicapped within the purview of 42 U.S.C. § 3602(h)[,] . . . that the party charged knew or should reasonably have known of his handicap . . .[,] [and] *that he requested a particular accommodation* that is both reasonable and necessary to allow him an equal opportunity to use and enjoy the housing in question.

*Astralis Condo. Ass'n v. Sec'y, United States Dept. of Hous. & Urban Dev.*, 620 F.3d 62, 67 (1st Cir.2010) (citing *DuBois v. Ass'n of Apart. Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir.2006); *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 603 (4th Cir.1997)) (emphasis added).

State appellate courts, interpreting their statutes that follow the FHAA, concur that the claimant must make a request. *See e.g., Lucas v. Riverside Park Condos. Unit Owners Ass'n*, 776 N.W.2d 801, 808 (N.D.2009) (quoting the elements from *DuBois*); *Lebanon Cnty. Hous. Auth. v. Landeck*, 967 A.2d 1009, 1012 (Pa.Super.2009) (quoting *Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109, 1129 (D.C.2005)). The District of Columbia Court of Appeals summarized the requirements for a FHA violation and stated:

---

**8.** Congress enacted the FHAA in 1988 to add a prohibition against discrimination on the basis of disability in the federal Fair Housing Act ("FHA"), which originally barred discrimination in housing on the basis of race, color, religion, or national origin. *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 (11th Cir.2008) (discussing the history of the FHAA and FHA).

**9.** 42 U.S.C. § 3604(f)(3)(B) states that unlawful discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

Under the Fair Housing Act, a landlord "is only obligated to provide a reasonable accommodation" to a tenant "*if a request for the accommodation has been made.*" A tenant who requests a "reasonable accommodation," moreover, should "make clear[ ]" to the landlord that "she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability." And "she should explain what type of accommodation she is requesting." On the other hand, the Fair Housing Act "does not require that a request be made in a particular manner." Even more importantly, the tenant's failure to make clear in her initial request "what type of accommodation she is requesting" is not fatal. According to applicable case law, including an administrative adjudication by HUD itself, once the tenant requests a "reasonable accommodation" (or, without using those exact words, requests an accommodation for a disability) the landlord is obliged under the Fair Housing Act to respond promptly. If the request is not sufficiently detailed to reveal the nature of that request, the Act—as properly interpreted—requires the landlord to "open a dialogue" with the tenant, eliciting more information as needed, to determine what specifics the tenant has in mind and whether such accommodation would, in fact, be reasonable under the circumstances. Any delay from the landlord's failure to respond promptly to the tenant's request may become the landlord's responsibility.

*Douglas,* 884 A.2d at 1122–23 (quoting HUD & Department of Justice Joint Statement on Reasonable Accommodations Under the Fair Housing Act, May 17, 2004, *available at* http://www.hud.gov/offices/fheo/library/huddojstatement.pdf, at 10–11) (emphasis added).

HUD and the Department of Justice ("DOJ") are both authorized to enforce the FHA. *See* 42 U.S.C. §§ 3612, 3614. HUD and DOJ issued a Joint Statement "regarding the rights and obligations of persons with disabilities and housing providers under the [Fair Housing] Act relating to reasonable accommodations." The Joint Statement asks and answers a series of questions to guide persons with disabilities. Ques-

tion 14 poses: "Is a housing provider obligated to provide a reasonable accommodation to a resident or applicant if an accommodation has not been requested?" HUD and DOJ answer:

> *No. A housing provider is only obligated to provide a reasonable accommodation to a resident or applicant if a request for an accommodation has been made.* A provider has notice that a reasonable accommodation request has been made if a person, her family member, or someone acting on her behalf requests a change, exception, or adjustment to a rule, policy, practice, or service because of a disability, even if the words "reasonable accommodation" are not used as part of the request.

HUD & DOJ Joint Statement on Reasonable Accommodations Under the Fair Housing Act, May 17, 2004, at 11 (emphasis added).

The Commission cites no case law in support of its contention that mere knowledge of a handicap satisfies the requirements of the FHAA or the Maryland equivalent in Article 49B § 22(a)(9). Instead, it cites its own administrative decisions in this very matter and urges this Court to limit our review. Even though an agency's interpretation of a statute the agency is charged with enforcing is entitled to deference, that deference is not limitless. *See Classics Chi.*, 189 Md.App. at 706–07, 985 A.2d 593. Therefore, we hold that the Campbell Company could not violate Article 49B § 22(a)(9) in the absence of an underlying request for a reasonable accommodation. *See Schwarz*, 544 F.3d at 1219 ("[A] plaintiff must actually request an accommodation and be refused in order to bring a reasonable accommodation claim under the FHA," and a lack of a underlying request is "fatal to the claim.").

The Commission argues that the plain meaning of "refuse" contravenes the purpose of Article 49B § 22(a)(9)—to ensure access for disabled individuals. While this is certainly a worthwhile purpose, the statute also states that it is to be "substantially equivalent or similar to the federal Fair Housing Amendments Act of 1988," which requires a request for

there to be a refusal. Chapter 571 of the 1991 Acts. The use of the word "refuse" and not "fail," "withhold," "deny," or a similar word in Article 49B § 22(a)(9) is controlling because "no matter how much expertise [an agency] had, it could not trump ... [t]he plain meaning of the statute" when the language is not ambiguous. *Adventist Health Care Inc. v. Md. Health Care Comm'n,* 392 Md. 103, 125, 896 A.2d 320 (2006). We hold that "refuse" is not ambiguous, even though the Commission used "refuse" and "fail" interchangeably in its decisions and arguments. As such, because neither Scarlett nor anyone on his behalf ever requested a reasonable accommodation from the Campbell Company, the Campbell Company could not have refused to make a reasonable accommodation in violation of Article 49B § 22(a)(9).

██ Even if we found the language to be ambiguous and the legislative intent unclear, we would not find the Commission's interpretation of Article 49B § 22(a)(9) to be convincing. "The weight given an agency's construction ... depends on several factors," including "the duration and consistency of the administrative practice" and "the degree to which the agency's construction was made known to the public." *Marriott Emps. Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 445, 697 A.2d 455 (1997); *see also INS v. Cardoza–Fonseca,* 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view."). This case presents the Commission's first opportunity to construe Article 49B § 22(a)(9) to prohibit the failure to make an unrequested accommodation, and the public has not been apprised of the statute's implications. As such, we give little deference to the Commission's broadening of the scope of the definition of "refuse." Moreover, in light of the legislative intent to conform to the federal FHAA and the overwhelming persuasive authority based on the federal FHAA and similar state laws, we hold that "to

refuse to make reasonable accommodations" requires an underlying request.

The Commission argues that a request would have been "pointless," but based on the facts presented, the Campbell Company appeared willing to work with Scarlett to resolve his concerns and help him access the building. Accordingly, we cannot say that had Scarlett made a request for an accommodation, that the request would have been "pointless."

While we certainly do not condone certain actions on the part of the Campbell Company or find favor with the Campbell Building's lack of accessibility at the time of the mediation, we are limited to the statutory language of Article 49B § 22(a)(9), under which the Commission brought a violation against the Campbell Company. The statutory language of Article 49B § 22(a)(9) requires a "refusal." Since there was no request made of the Campbell Company, it could not refuse in violation of Article 49B § 22(a)(9). Based on this conclusion, we need not reach the Campbell Company's second question.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE ORDER OF THE MARYLAND COMMISSION ON HUMAN RELATIONS AND TO REMAND THIS CASE TO THAT AGENCY WITH INSTRUCTIONS TO DISMISS THE CHARGES.**

**APPELLEE TO PAY COSTS.**