Filed 4/12/13  P. v. Mihajson CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055245 |
| v. | (Super.Ct.No. INF066716) |
| VANESA MICHELLE MIHAJSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Graham Anderson Cribbs, Judge.  (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

Defendant Vanesa Michelle Mihajson appeals from her conviction of being an accessory to murder (Pen. Code,[1] § 32.)  She contends the trial court erred in (1) denying her motions to suppress evidence seized during a traffic stop because the time and scope of the detention exceeded the ostensible basis for the stop; and (2) admitting evidence of her brother's statements to the police because they were hearsay, they were testimonial, and their admission violated the Confrontation Clause and the principles set forth in *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).  We find no error, and we affirm.

## II. FACTS AND PROCEDURAL BACKGROUND

Before October 12, 2007, defendant shared a condominium on Portola in Palm Desert with her brother, Sean Mihajson (Sean), and his girlfriend, Katie Weddle.  Sean was not employed, but he obtained money by selling marijuana to friends.  Defendant's friend Karen Reyes had seen Shalonda Morris,[2] at the condo.  Defendant told Reyes more than once that Sean planned to set up a fake deal to steal money from Morris by pretending he had drugs to sell her.  Defendant told Reyes, "yes, it's going to happen; no, it's not going to happen.  I talked him out of it; no, I didn't talk him out of it, so on, so

---

[1] All further statutory references are to the Penal Code unless as otherwise indicated.

[2] Morris is also referred to in the record as "Shae," "Shay," "Shae Shae," or "Shay-Shay" at the condo.

forth." She said she had told Sean not to do it, but he nonetheless intended to go through with the scheme.

On October 12, Reyes met defendant, who told her that Sean was "going through with their plan." Defendant told Reyes "that her brother had planned to steal—take the money from [Morris] and that she didn't know why; supposedly, they had duct tape and plastic bags," although defendant had told Reyes she was not sure why. Later, defendant told Reyes there was "[n]o more Shay," that Shay was "gone." Reyes understood that to mean that Morris was dead. Defendant also told Reyes that Sean "had to clean up the mess and that she and [Weddle] had to wait" at the mall. Defendant went to Reyes's house with Weddle, where they waited for Sean to finish cleaning. Defendant kept calling Sean to ask where he was and how long it was going to be. Sean eventually picked up defendant and Weddle. Reyes did not see defendant again in person, but defendant told her in a telephone conversation that their plan was to go to Las Vegas to "lay low for a while." Another time, defendant said her brother wanted her to turn her phone off and she should not have contact with anyone. Defendant asked Reyes not to tell anyone what she knew.

About 11:00 a.m. on October 12, 2007, Daniel Lawrence, who was dating defendant at the time, received a telephone call from her. She told him she "needed to get out of the house," and "needed somebody to get her mind off of stuff." They arranged to meet at a mall in Palm Desert, where they sat in the bed of Lawrence's truck, smoked cigarettes, and "gossiped." Defendant seemed stressed. She received a telephone call, and she told Lawrence she needed to run an errand. They went together to

3

a Lowe's store, where she purchased plastic sheeting and duct tape. A surveillance video from Lowe's that showed the couple purchasing the items was played for the jury. Defendant "wouldn't give [Lawrence] a straight answer" when he asked what the items were for, but she said they were for her brother.

Later, possibly on the same day, Lawrence met defendant at another shopping center in Rancho Mirage. Defendant said she was staying at a hotel and was moving to Las Vegas. Lawrence received a message through the social network "MySpace," in which defendant said she was moving to New York. Defendant told him the same thing in a telephone call. In one telephone conversation, defendant was upset that Lawrence had disclosed her location as Las Vegas. She told him to delete all their MySpace messages.

Weddle[3] testified that on October 12, Sean took her to work in the morning. After work, Sean, possibly accompanied by defendant, picked her up at approximately 4:00 or 4:30 p.m. They had previously planned to leave for Las Vegas to stay there. Weddle packed some clothes but left other belongings in the condo, intending to come back for them later. The three went to the mall, where Sean dropped off the women, gave each of them about $300, and told them to go shopping. They stayed at the mall until it closed at 9:00 p.m., then sat in Reyes's car, and eventually went with Reyes to her house. After Sean picked them up, they went to a hotel. In the hotel room, Sean had "a significant amount of money" in a little backpack, and Weddle, defendant, and Sean counted the

---

[3] Weddle was granted use immunity for her testimony.

4

money.  On October 13, Sean left the hotel alone and was gone all day.  They stayed at the hotel a day or two and then spent another day or two at a hotel in Rancho Mirage.  When they finally went to Las Vegas, they stayed at a hotel a few days.  Weddle received a telephone call in which someone asked for Sean.  When Weddle said Sean was in the shower, the voice said, "'Give her back,'" or "'where is she?'  'Give her back[.]'"  Morris's name was mentioned in the call.  Sean told Weddle to turn off her cell phone and not use it.  After leaving the hotel in Las Vegas, Sean, Weddle, and defendant moved to a house where defendant's brother, Victor, joined them.

About three weeks after October 12, defendant, Sean, and Weddle returned to the condo "to grab whatever [they] couldn't fit in the car the first time."  They stayed only 10 or 15 minutes, just long enough to get their things.  At one point, Sean told Weddle to go outside to see if anyone was coming.  Weddle noticed that the carpet in the hallway looked different; her room had been painted; the lamp shades were different; and the blinds had been changed.  Defendant and Sean got on the floor on their hands and knees, using their cell phones for light, and appeared to be looking for something on the carpet.  When Weddle eventually returned to California, she was interviewed by the police and told them about the money, the telephone calls, and Sean's statements.

Morris's partner, Cynthia Garcia, contacted the police on October 13, 2007, after Morris failed to return home.  Garcia last spoke to Morris at approximately 2:30 p.m. on October 12.  Morris's father had not heard from Morris since the morning of October 12, although they usually spoke at least every other day.  Morris's mother last heard from Morris on October 2, and her telephone calls to Morris had not been returned.  Morris's

5

brother last spoke to her on October 12, despite having placed more than 100 unanswered calls to her cell phone. On November 7, 2007, a deputy sheriff ran the license plates on an illegally parked vehicle in Palm Desert and learned the vehicle belonged to Morris, who had been reported missing. All of Morris's clothing and personal items were left at Garcia's house, and Morris's body was never found. Morris had gone to prison in early 2000 for drug sales. She had been diagnosed with breast cancer in 2005, and she smoked medicinal marijuana.

Lawrence contacted the police after having a conversation with Reyes about Morris. On December 11, 2007, sheriff's investigators learned that defendant and Sean were in the area. They made a traffic stop of the car Sean was driving with defendant as a passenger. In a field interview, Sean initially denied knowing Morris, but then said she was "mixed in a crowd" he did not associate with; he had not seen or spoken to her for about a year; and defendant did not know her. Defendant was shown a photograph of Morris and said she had never seen her.

Defendant and Sean were transported to the police station, where they were interviewed. Portions of the video and audio recordings of defendant's interview were played for the jury. Defendant initially said she did not know Morris and had never seen her. Defendant denied that Sean had sent her to Lowe's to buy things, and she denied any involvement in Morris's murder. Defendant eventually admitted she had seen Morris before. She also admitted Sean had telephoned and told her to pick up tape and plastic, and she then "put two and two together." She purchased the requested items and took them to Sean at their condo. She asked Sean what the items were for, and he told her not

6

to worry.  She denied knowing of any drug deal between Sean and Morris.  Defendant discussed the money she and Weddle spent at the mall.  She said Weddle had purchased things for her with money Weddle got from Sean, who in turn had gotten the money from Morris.

Defendant was later placed in an interview room with Sean, and the police recorded their interaction.  They spoke to each other partly in Romanian.  An interpreter translated their conversation at trial, and the jury was provided with a translated transcript.  During the conversation, Sean said, among other things, "'Don't say anything.  They can't find out about her' or 'They cannot find her'"; "'They don't think that you did it.  They don't think that I did it.  Trust me'"; and "'Don't say anything.'"  Sean asked defendant why she told the police she had given him the duct tape and said it was "'the only thing they have.'"  He said she "should not have said anything," and she should now "[t]ell them that you got that thing for your . . . boss.  Why did you say that you gave it to me, at the gate?  What am I going to do about it?"  They spent time trying to get their stories straight, and Sean said, "That girl fits full length into it," or "'the whole girl fits from head to toe.'"  Defendant was released from custody after the conversation with her brother.

## A.  Defense Evidence

Victor Mihajson, defendant's father, testified that he was born in Yugoslavia, and he and his children spoke the Romaneste language, a distinct language from Romania.  He stated neither defendant nor Sean knew Romanian.  Victor listened to the tape of the conversation between defendant and Sean at the station, and he testified that portions of

7

the conversation had been mistranslated.  Specifically, Sean had not said anything about a girl fitting full length into anything, but he had said, "'She is in my mind, my head, can't stop thinking of her.  I know that she said about money that she saw.'"

## B.  Verdict and Sentence

The jury found defendant guilty of being an accessory to murder (§ 32).  The trial court placed her on probation for 36 months under various terms and conditions.

## III.  DISCUSSION

## A.  Motions to Suppress Evidence

Defendant contends the trial court erred in denying her motions to suppress evidence seized during a traffic stop because the time and scope of the detention exceeded the ostensible basis for the stop.

### 1.  Additional Background

In October 2009, defendant moved to suppress the evidence[4] arising from the December 11, 2007, traffic stop.  Following the preliminary hearing, the magistrate denied the motion.  In November 2009, defendant again moved to suppress the evidence. Defendant submitted no additional evidence, and again the motion was denied.

On September 11, 2011, defendant moved a third time to suppress the evidence arising from the traffic stop and to suppress her extrajudicial statements on the ground of

---

[4] Specifically, defendant sought to suppress Sean's and her own statements to officers and to each other on the ground the statements were the product of an improperly prolonged traffic stop.

*Miranda*[5] violations.  The trial court conducted an evidentiary hearing, at which Investigator Rickie Simms of the Riverside County Sheriff's Department testified that in December 2007, he was conducting a missing person's investigation regarding Morris. During the investigation, information was obtained linking defendant and Sean to the murder of Morris.  After learning defendant and Sean were driving from Las Vegas to drop off Weddle, Investigators Simms and Gary LeClair,[6] along with several other officers, waited in unmarked cars at the expected drop-off point, a business complex in Palm Desert.  Investigator LeClair saw the car drop off Weddle and then drive away, with Sean driving and defendant in the passenger seat.  LeClair requested that the car be stopped because it did not have a front license plate in violation of the Vehicle Code; however, they actually wished to investigate the possible homicide.  Deputy Morton, driving a marked patrol car, stopped the car.  Five officers were present after the traffic stop; only Deputy Morton wore a uniform, while the rest wore plain clothes.

Investigator LeClair spoke with Sean for about 15 minutes, both about the license plate and about Morris.  LeClair told Sean he was not under arrest and was free to leave. Sean said he wanted to speak to his father and would come to the police station another time, and LeClair responded, "'No.  I want you to go now.'"  LeClair asked Sean if he would release the car to defendant, but Sean declined to do so, saying he did not trust her with it.

---

[5]  *Miranda v. Arizona* (1966) 384 U.S. 436.

[6]  By the time of trial, LeClair had been promoted to sergeant.

9

Ten to 15 minutes into the stop, Investigator Simms began to question defendant, who was sitting in the front passenger seat while Sean was standing near LeClair's unmarked car. The investigator recorded the conversations involving defendant and Sean. Sean was transported away in one of the police vehicles while the investigator was still talking to defendant.

Investigator Simms asked defendant if she would go to the police station to talk to him, and she said she would if Sean went as well. Defendant was handcuffed toward the end of the conversation, just before she was transported to the police station. When they got to the police station, Investigator LeClair took off her handcuffs and interviewed her for an hour and a half to two hours and a half.

The trial court stated it had read and considered the transcript of the preliminary hearing before ruling on defendant's motion.[7] At the preliminary hearing, Investigator Simms testified that defendant was "a person of interest" in connection with Morris's disappearance or murder, and the officers believed she had information about Morris. Through interviews with witnesses, Investigator Simms had learned that defendant had several conversations with Sean on the day Morris went missing. Investigator LeClair

---

[7] Defendant summarily discounts the evidence from the preliminary hearing on the ground that "the court nowhere indicated what specific evidence adduced during that hearing, other than the mere fact that an investigation was underway, supported its conclusionary finding that probable cause existed in this case." We, in contrast, presume the trial court did exactly what it said it had done, e.g., read and considered the preliminary hearing transcript before ruling on the motion. (See Evid. Code, § 664.) The fact that the trial court did not refer to specific evidence from that transcript before issuing its ruling is irrelevant when evidence in the transcript supports the trial court's ruling.

testified that Lawrence told him defendant had gone to the Lowe's store to purchase the duct tape and plastic sheeting. Reyes had reported that when she was at the mall on October 12, defendant had said "the deal was done, Shae was gone, and Sean was home cleaning up," and Reyes interpreted the statement to mean "[t]hat Shae was dead."

Garcia told a detective that on October 12, 2007, Morris had gone to Palm Desert to meet with a person named Sean at a smoke shop. Another investigator told Investigator LeClair that John Delgadillo had reported that Delgadillo and Morris had a drug deal set up with Sean that day to purchase a pound of marijuana for about $7,600. Telephone records showed that Morris and Sean had been communicating with each other. Reyes told Investigator LeClair that defendant told her that Sean had set up "a bogus drug deal" with Morris, and that Morris was going to go to defendant's condo on October 12, and defendant was supposed to stay away from the condo that day. On November 19, 2007, defendant and Sean became suspects in Morris's homicide investigation.

The trial court found that "probable cause [for the traffic stop] existed . . . because of the license plate issue; [and] . . . there was probable cause for the stop based upon law enforcement at that time, having knowledge of the fact of a missing person and that that was being investigated by those individuals." The trial court further found that no *Miranda* violation had occurred. The trial court therefore denied defendant's motion to suppress.

*2. Analysis*

"[T]he lack of a front license plate has long been recognized as a legitimate basis for a traffic stop. [Citations.]" (*People v. Saunders* (2006) 38 Cal.4th 1129, 1136.) Thus, the initial stop was indisputably supported by probable cause. Moreover, the evidence in the record, including the preliminary hearing testimony recounted above, establishes that the officers had specific, articulable facts supporting the conclusion that defendant and Sean were involved in Morris's murder. "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.) The evidence known to the officers in this case would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that defendant was an accessory to murder. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1037.) Thus, the length of the detention was not limited to the time it would take to issue a citation for the Vehicle Code violation, but rather to the time it would take to investigate their involvement in the murder. (See *People v. Gomez* (2004) 117 Cal.App.4th 531, 537 [stopping the defendant's vehicle for a seatbelt violation was "entirely legal" even if the stop was a pretext for a narcotics investigation].)

Defendant argues that by "devising and implementing" the pretext of stopping the car because it was missing a front license plate, "police essentially conceded no probable cause then existed to arrest or otherwise detain either Sean or [defendant] . . . ." However, we measure probable cause by an objective standard, not by a subjective

12

standard (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1266), and we determine the validity of an arrest by whether the officer knew facts that supported a reasonable suspicion of criminal activity, not by whether those facts would be sufficient to obtain a conviction. (*People v. Hill* (1974) 12 Cal.3d 731, 749, overruled on another ground in *People v. DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5.) The evidence set forth above more than meets that standard. The trial court properly denied the motion to suppress.

**B. Admission of Brother's Statements**

Defendant contends the trial court erred in admitting evidence of her brother's statements to the police and to defendant because they were hearsay, and their admission violated the confrontation clause. Defendant also argues that admission of Sean's statements violated the principles set forth in *Aranda* and *Bruton*.

*1. Additional Background*

Defendant objected to the admission of the statements Sean made after the December 11, 2007, traffic stop and the statements he made to defendant when they were placed together in a police interview room. The trial court ruled that Sean's statements were nontestimonial, and they fell within the exception to the hearsay rule for statements against penal interest. The trial court therefore allowed the statements to be admitted into evidence. It was undisputed that Sean was unavailable as a witness because he invoked his Fifth Amendment privilege against self-incrimination.

*2. Nontestimonial Statements*

Under the Sixth Amendment's Confrontation Clause, "'[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

13

against him.'" (*Crawford v. Washington* (2004) 541 U.S. 36, 42.) The confrontation clause bars admission of "testimonial" hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. (*Crawford*, *supra*, at pp. 53-54, 68.) "If the statement is not testimonial, it does not implicate the confrontation clause, and the issue is simply whether the statement is admissible under state law as an exception to the hearsay rule." (*People v. Garcia* (2008) 168 Cal.App.4th 261, 291.) Although the *Crawford* court did not define testimonial statements, it listed as examples among other things, "'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; [and] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Crawford*, *supra*, at pp. 51-52.)

Defendant argues the challenged statements were testimonial because "police obviously intended to obtain information to be used against [defendant and Sean], essentially relying upon [them] to 'interrogate' each other . . . ." Defendant's focus on the officers' intentions is misplaced. In the analogous case of *People v. Arauz* (2012) 210 Cal.App.4th 1394, the defendants contended that an accomplice's jailhouse statements to a paid confidential informant were testimonial hearsay, and the admission of those statements violated their rights of confrontation and cross-examination. (*Id.* at pp. 1401-1402.) The court rejected that contention, explaining that when he made the statements, the accomplice "thought he was answering to the Mexican Mafia. He had no belief that his statements were being monitored and would be used in a subsequent trial. [Citation.]

14

Federal courts have repeatedly held that statements unwittingly made to an informant are not 'testimonial' for confrontation clause purposes. [Citations.] We agree with the rule and rationale of these cases. We hold that statements unwittingly made to an informant are not 'testimonial' within the meaning of the confrontation clause. The last thing [the accomplice] expected was for his statement to be repeated in court. [Citation.]" (*Id*. at p. 1402.) The same analysis applies to the facts before us. By speaking in Romanian, defendant and Sean clearly did not anticipate that their conversation would be used in court. The challenged evidence was not testimonial.

### 3. Statements Against Penal Interest

Having concluded the statements were not testimonial, we next turn to whether the statements were admissible under an exception to the hearsay rule. (*People v. Garcia*, *supra*, 168 Cal.App.4th at p. 291.) Here, as noted, the trial court found the statements were against Sean's penal interest.

Evidence Code section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." We apply the deferential abuse of discretion standard to review a trial court's determination that a statement is against a declarant's penal interest and is sufficiently trustworthy to be admitted under the exception to the hearsay rule for such statements. (*People v. Lawley* (2002) 27 Cal.4th 102, 153-154.)

15

To determine whether a statement is trustworthy and therefore qualifies for admission as a statement against penal interest, the court looks to "'the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.]' [Citation.]" (*People v. Bryden* (1998) 63 Cal.App.4th 159, 175.) Here, the statements were made in a station house interview room where defendant and her brother had been placed together. The statements were made in Romanian, in an apparent attempt to prevent officers from learning what was said. The statements were made from personal knowledge. Sean's motivation appears to have been to coordinate their stories. While Sean's statements, on their face, might appear innocuous, they must be considered in context. We conclude the trial court did not abuse its discretion in determining the statements were admissible as declarations against penal interest.

Defendant argues that Sean's statements, particularly with respect to the sheeting and duct tape defendant purchased, "constituted the only direct evidence linking [her] purchase of the sheeting to the alleged murder." Defendant cannot have it both ways—in other words, she cannot logically argue that the statement was not against Sean's penal interest and simultaneously argue that the statement was the only direct evidence linking her to the murder.

Her conviction of being an accessory "require[d] proof that a principal committed a specified felony, [she] knew that the principal had committed a felony, [she] did something to help the principal get away with the crime, and that as a result of this action

16

[she] intended to help the principal get away with the crime. [Citations.]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 536.) Here, defendant herself told Investigator LeClair that Sean had telephoned her and told her to buy the duct tape and sheeting, and that was when she "put two and two together." She said she and Lawrence purchased the items and delivered them to Sean at the gate of the condo complex. Lawrence testified that he accompanied defendant to purchase the items after she received a telephone call, and defendant told him the items were for her brother. Lowe's provided the police with a videotape of defendant and Lawrence buying the duct tape and plastic sheeting, and the videotape was shown to the jury. Reyes testified that defendant had said Sean was "going through with their plan," that it was "in progress," and that they had duct tape and plastic bags. Defendant told her "there is no more Shay, that Shay was gone," and that Sean "had to clean up the mess and that she and [Weddle] had to wait" at the mall. Defendant went with Sean and Weddle to Las Vegas and admitted they had been hiding from the police. Even if we presume error for purposes of argument, it was harmless beyond a reasonable doubt under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

### 4. *Aranda/Bruton*

Defendant further argues that admission of Sean's statements violated the principles set forth in *Aranda* and *Bruton*. Under *Aranda* and *Bruton*, the improper admission of the statement or confession of a nontestifying codefendant that implicates the defendant violates the defendant's right to confront and cross-examine witnesses. (*Aranda*, *supra*, 63 Cal.2d at p. 530; *Bruton*, *supra*, 391 U.S. at pp. 126-127, 134-135.)

17

In *People v. Fletcher* (1996) 13 Cal.4th 451, at pages 463 through 464, our Supreme Court held that the United States Supreme Court's opinion in *Richardson v. Marsh* (1987) 481 U.S. 200 limited the application of *Bruton* to facially incriminating confessions of a codefendant in a joint trial. (See *People v. Homick* (2012) 55 Cal.4th 816, 874.) Defendant and Sean were not tried jointly. Moreover, even if they had been tried together, Sean's statements would have been admissible either as nonhearsay or as declarations against penal interest. Thus, the *Aranda/Bruton* rule does not apply.

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

RICHLI
J.

CODRINGTON
J.